ORIGINAL

FILED

07 OCT 29 PM 12:32

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

CATHERINE A. CONWAY (SBN 98266)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiffs,<br><br>v.<br><br>CONOCOPHILLIPS COMPANY AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No. '07 CV 2048 IEG (RBB)<br><br>**DEFENDANT CONOCOPHILLIPS COMPANY'S CERTIFICATE OF SERVICE OF NOTICE TO ADVERSE PARTIES OF REMOVAL TO FEDERAL COURT**<br><br>[Civil Cover Sheet; Notice of Interested Parties; Notice of Removal of Action; and Notice of Related Cases filed concurrently herewith]<br><br>(San Diego Superior Court, Case No. 37-2007-00074151-CU-WT-CTL) |

I, David Kirvan, certify and declare as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is: 2029 Century Park East, Suite 2400, Los Angeles, California, 90067.

3. I am familiar with my employer's mail collection and processing practices; know that said mail is collected and deposited with the United States Postal Service on the same day that it is deposited in the interoffice mail; and know that the postage thereon is fully prepaid.

4. Following said practice, on October 29, 2007, I placed a copy of the Notice to Adverse Parties and the Superior Court of Filing of Removal of Civil Action to the United States District Court, a copy of which is attached to this Certificate of Service as Exhibit "A", in a sealed envelope addressed to plaintiff's counsel and caused it to be delivered via U.S. Mail placed the envelope(s) for collection and mailing, following our ordinary business practices.

5. On October 29, 2007, I gave notice to the Clerk of the Superior Court for the County of Los Angeles by filing the Notice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2007 at Los Angeles, California.

By: [signature]
David Kirvan

EXHIBIT A

**AKIN GUMP STRAUSS HAUER & FELD LLP**
CATHERINE A. CONWAY (SBN 98366)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiff,<br><br>v.<br><br>CONOCOPHILLIPS AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No. 37-2007-00074151-CU-WT-CTL<br><br>[Hon. Kevin A. Enright]<br><br>**NOTICE TO ADVERSE PARTIES AND THE SUPERIOR COURT OF FILING OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §§ 1332, 1441(a), 1446 TO THE UNITED STATES DISTRICT COURT**<br><br>Date Action Filed: August 27, 2007 |

EXHIBIT A

PAGE 2

**TO THE CLERK OF THE ABOVE-REFERENCED COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 29, 2007, defendant, ConocoPhillips Company, has filed a Notice of Removal of the above-entitled action pursuant to 28 U.S.C. §§ 1332, 1441(a), 1446 in the United States District Court for the Southern District of California. Pursuant to 28 U.S.C. § 1446(d), this court "shall proceed no further unless the case is remanded." A true and correct copy of the Notice of Removal filed with the federal court is attached hereto as Exhibit 1. A true and correct copy of the Supporting Declaration of Jeremy F. Bollinger is attached hereto as Exhibit 2. A true and correct copy of the Supporting Declaration of Russ H. Oechsel, Jr., is attached hereto as Exhibit 3.

Dated: October 29, 2007

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Catherine A. Conway
Julia I. De Beers
Jeremy F. Bollinger

By [signature]
Jeremy F. Bollinger
Attorneys for Defendant
ConocoPhillips Company

EXHIBIT A
PAGE 3

# Exhibit 1

Exhibit 1

EXHIBIT A

PAGE 4

CATHERINE A. CONWAY (SBN 98266)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiffs,<br><br>v.<br><br>CONOCOPHILLIPS COMPANY AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No.<br><br>**DEFENDANT CONOCOPHILLIPS COMPANY'S NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441(a), 1446**<br><br>**(DIVERSITY)**<br><br>[Declarations of Russ H. Oechsel, Jr., and Jeremy F. Bollinger in Support of Defendant ConocoPhillips Company's Notice of Removal of Action; Civil Cover Sheet; Certificate of Service of Notice to Adverse Parties; Certification as to Interested Parties; and Notice of Related Cases filed concurrently herewith]<br><br>(San Diego Superior Court, Case No. 37-2007-00074151-CU-WT-CTL) |

EXHIBIT A
PAGE 5

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that Defendant ConocoPhillips Company ("ConocoPhillips") hereby removes to this Court the state court action described below. In support thereof, Defendant states as follows:

1. On August 27, 2007, Plaintiff filed an action against Defendant ConocoPhillips in the San Diego County Superior Court entitled Michael D. Dowd v. ConocoPhillips and ConocoPhillips Marine, Case No. 37-2007-00074151-CU-WT-CTL (the "State Court Action"). See Declaration of Jeremy F. Bollinger in Support of ConocoPhillips' Notice of Removal of Action ("Bollinger Decl.") ¶ 2.

2. On September 25, 2007, Defendant was mail served with a copy of the Summons and Complaint on September 5, 2007. On September 25, 2007, Defendant executed a copy of the Notice and Acknowledgement of Service, thus facilitating service on that date. See id. Attached as **Exhibit A** to the Bollinger Declaration is a true copy of the Summons, Complaint, and executed Notice and Acknowledgement of Service. See Bollinger Decl. ¶ 3. Attached as **Exhibit B** to the Bollinger Declaration is a true copy of the Notice of Case Assignment served with the Summons and Complaint. See Bollinger Decl. ¶ 4.

3. On October 29, 2007, Defendant filed an Answer to the Complaint in San Diego County Superior Court. See Bollinger Decl. ¶ 5. Attached as **Exhibit C** to the Bollinger Declaration is a true copy of ConocoPhillips' Answer to Plaintiff's Complaint. See Bollinger Decl. ¶ 5.

4. ConocoPhillips' Notice of Removal is timely because it is filed within thirty (30) days of service. See 28 U.S.C. § 1446(b); see also Wagner v. City of South Pasadena, 78 Cal. App. 4th 943, 948-950 (2000) (deadline to respond to the complaint is 30 days from when defendant signs and dates the notice and acknowledgement form). Service of the Summons and Complaint was effected on September 25, 2007 when Defendant executed a copy of the Notice and Acknowledgement of Service. See Bollinger Decl. ¶¶ 2-3.

5. **Jurisdiction**. This action is a civil action of which this Court has original diversity jurisdiction under 28 U.S.C. § 1332 because the State Court Action is (a) between citizens of different





EXHIBIT A
PAGE 6

states, and (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Under 28 U.S.C. § 1441(a), a defendant may remove to federal district court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction . . . ."

6. **Diversity of Citizenship**. At all relevant times, there has been diversity of citizenship between the parties to the action. ConocoPhillips is informed and believes that Plaintiff Michael D. Dowd, at the time this action was commenced, was a citizen and resident of the State of California. See Complaint ¶ 1.

7. ConocoPhillips is not a citizen of the State of California. "[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ." 28 U.S.C. § 1332(c)(1). ConocoPhillips has not been incorporated in California. Rather, at the time this action was commenced, ConocoPhillips was a corporation organized and incorporated under the laws of the State of Delaware. See Declaration of Russ H. Oechsel, Jr., in Support of Defendant ConocoPhillips' Notice of Removal of Action ("Oechsel Decl."), Exh. A. Nor is California the state in which ConocoPhillips has its principal place of business. Rather, as shown below, ConocoPhillips' principal place of business is located in Texas.[1]

8. In the Ninth Circuit, the "principal place of business" is determined by a two-part inquiry. *First*, the Court applies the "place of operations" test to determine in what state, if any, a "substantial predominance" of corporate activity takes place. *Second*, if the corporation's activities are not predominant in a single state, the Court applies the "nerve center" test to identify the state in which the majority of the corporation's executive and administrative functions are performed. See United Computer Systems, Inc. v. AT&T Corp., 298 F.3d 756, 763 (9th Cir. 2002).

9. The "place of operations" test is determinative "where a corporation conducts 'substantially all' of its operations in one state and its headquarters are located in another state." Industrial Tectonics, Inc. v. Aero Alloy, 912 F.2d 1090, 1093 (9th Cir. 1990) ("courts generally assign

---

[1] "[28 U.S.C. § 1332(c)] makes clear that every corporation has one and only one principal place of business." J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 406 (5th Cir. 1987), citing S.Rep. No. 1830, 85th Cong., 2d Sess., reprinted in 1958 U.S.C.C.A.N. 3099, 3102 (corporation to be regarded as "citizen of that *one* State in which was located its principal place of business" (emphasis added)).



EXHIBIT A



PAGE 7

greater importance to the corporate headquarters when no state is clearly the center of corporate activity"). However, the "place of operations" test cannot properly identify a corporation's principal place of business where the corporation has operations spread throughout the country. See Breitman v. May Co. California, 37 F.3d 562, 564 (9th Cir. 1994) ("Because no one state contains a substantial predominance of the corporation's business activities, the place of operations test is inappropriate"); Ho v. Ikon Office Solutions, Inc., 143 F. Supp. 2d 1163, 1168 (N.D. Cal. 2001) (where national corporation has business activity spread among a substantial number of states, "use of the 'place of operations' test would not reliably identify the one state that should be deemed the center of corporate activity"). To determine whether "substantial predominance" in a particular state exists, courts look to several factors, including the location of employees, tangible property, production activities, sources of income, and the corporation's executive and administrative functions. See Tosco Corp. v. Communities for a Better Environment, 236 F.3d 495, 500-502 (9th Cir. 2001).

10. ConocoPhillips' operations do not substantially predominate in California. The Company's executive and administrative operations are centrally managed from Texas, not California. From ConocoPhillips' headquarters in Texas, ConocoPhillips makes and implements company-wide operating, financial, employee relations, marketing, development, customer care, accounting, income tax, treasury, and legal policy decisions. The Company's board room is located in Texas. Board member meetings generally take place there, New York or Washington, D.C. Stockholders meetings are also held in Texas. Additionally, financial records are maintained in Texas. See Oechsel Decl. ¶¶ 2-6.

11. ConocoPhillips employs more people in Texas than in any other state, and more than twice the number of employees in California. See Oechsel Decl. ¶ 11. California represents the third largest number of ConocoPhillips employees (2581), behind Texas (6706) and Oklahoma (4474). See id. Furthermore, considering California's significantly larger population than any other state, ConocoPhillips employs fewer people on a per capita basis in California than in Texas, as well as most other states. See id. Based on the most recent population data from the U.S. Census Bureau (see http://quickfacts.census.gov) and current Company data, ConocoPhillips employs more people per





EXHIBIT A
PAGE 8

thousand residents in Alaska (1.7), Oklahoma (1.3), Montana (0.43), Texas (0.32), Louisiana (0.32), New Mexico (0.47), Colorado (0.14), New Jersey (0.11) and Washington (0.11) than it does in California (0.07).[2] For this reason as well, ConocoPhillips' operations do not substantially predominate in California.

12. ConocoPhillips operates twelve refineries in the United States, including two in Texas, two in Louisiana, two in California, and one in each of the remaining six states in which its refineries are located. See Oechsel Decl., Exh. B at 47-51. The two California refineries' combined crude oil processing capacity (259 million barrels per day or MBPD) is less than that of the two Texas refineries combined (393 MBPD) and less than that of the two Louisiana refineries combined (486 MBPD). Id. Even some states with single refineries exceed or have equivalent capacities to the California refineries combined. See id. (Wood River, Illinois (306), Bayway, New Jersey (238 MBPD), Trainer, Pennsylvania (185 MBPD)).

13. ConocoPhillips owns or has an interest in approximately 30,000 miles of pipeline in the United States. Only 792 miles of its pipeline (or 2%) traverse California. See Oechsel Decl., Exh. B at 54. More than 1,250 miles of pipeline span Texas, not including most of the 542 miles of pipeline stretching between the Sweeny refinery in the southern Gulf coast of Texas to Cushing, Oklahoma. See id.

14. In the United States, ConocoPhillips markets its products through approximately 9,076 outlets in 49 states. California has nearly the equivalent number of outlets as Texas and Missouri. See id. at 40; Oechsel Decl. ¶ 13 (California has 1,201, Texas has 1,032, and Missouri has 944).

15. ConocoPhillips participates in the chemicals sector through its 50 percent ownership of Chevron Phillips Chemical Company LLC (CPChem), a joint-venture with ChevronTexaco, headquartered in The Woodlands, Texas. See Oechsel Decl., Exh. C. The majority of CPChem's major facilities in the United States are located in Texas. Its other major facilities are located in

[2] The U.S. Census Bureau's web site indicates that the populations of these states, as of the 2000 census, were: Alaska (626,932), Oklahoma (3,450,654), Montana (902,195), Texas (20,851,820), Louisiana (4,468,976), New Mexico (1,819,046), Colorado (4,301,261, New Jersey (8,414,350), Washington (5,894,121) and California (33,872,648). See http://quickfacts.census.gov.



EXHIBIT A
PAGE 9

Louisiana, Mississippi and Ohio. None are located in California. See id. For all these reasons, ConocoPhillips' operations do not substantially predominate in California. If ConocoPhillips' operations substantially predominate in any one state, that state is Texas.

16. Even if ConocoPhillips' operations do not substantially predominate in Texas, Texas still would be the Company's principal place business under the alternative "nerve center" test. Where, as here, a corporation's activities are arguably widespread and its operations are conducted in many states, courts apply the "nerve center" test to determine the company's principal place of business. See Engels v. Exel Global Logistics, Inc., No. C 04-3944 MHP, 2005 WL 850879, *5 (N.D. Cal. April 11, 2005); Arellano v. Home Depot U.S.A., Inc., 245 F. Supp. 2d 1102, 1106 (S.D. Cal. 2003); Ho, 143 F. Supp. 2d at 1165. Under the "nerve center" test, the principal place of business is the state where the majority of executive and administrative functions are performed. See Tosco, 236 F.3d at 500. Relevant factors include where executives reside and maintain offices, where administrative and financial offices are located, where directors and stockholders meet, where income tax returns are filed, and where day-to-day control over the company is executed. See Unger v. Del E. Webb Corp., 233 F. Supp. 713, 716 (N.D. Cal. 1964), accord State Farm Fire & Casualty Co. v. Byrd, 710 F. Supp. 1292, 1293 (N.D. Cal. 1989).

17. Under the "nerve center" test, ConocoPhillips' principal place of business is in Texas. As explained above, the vast majority of the corporation's executive and administrative functions occur in Texas. For example, all of the executive officers of ConocoPhillips, including the president, chief financial officer, executive vice-presidents, and general counsel, maintain their offices at ConocoPhillips' headquarters in Houston, Texas. See Oechsel Decl. ¶ 3. From its Texas headquarters, ConocoPhillips manages day-to-day operations company-wide, including determining and implementing policy regarding human resources, marketing, finance, accounting, income tax, product distribution, and legal issues. Id. at ¶¶ 2-4. The Company's board room is in Texas where the board of directors generally meet, and the stockholders meetings are held in Texas. Id. at ¶ 5. While its tax returns are filed from its offices in Oklahoma, the Company's financial records are maintained in Texas. Id. at ¶¶ 6-7. In short, because ConocoPhillips' executive and administrative functions are

concentrated in Texas, under the "nerve center test," Texas is ConocoPhillips' principal place of business. See Tosco, 236 F.3d at 500.

18. ConocoPhillips has no knowledge that any Doe Defendants have been served in this action, and the citizenship of such fictitious defendants is disregarded for purposes of removal. See 28 U.S.C. § 1441(a).

19. Although ConocoPhillips Marine is named as a defendant in this action, it is not a separate corporate entity from ConocoPhillips, and, therefore, has no impact on the diversity of the parties here. See Oechsel Decl. ¶ 14.

20. **Amount in Controversy**. Defendant avers, for purposes of this Notice only, that if Plaintiff prevailed on the claims asserted in this action, the requested monetary recovery would exceed $75,000.[3] Plaintiff alleges that he "has suffered loss of wages and benefits, emotional distress, pain and suffering, humiliation and embarrassment" for which he seeks compensatory and punitive damages. Complaint ¶¶ 20, 21, 25, 26.

21. To establish the amount in controversy, which includes compensatory damages, punitive damages, and attorneys fees, a removing defendant "may introduce evidence of jury verdicts in cases involving analogous facts." Simmons v. PCR Tech., 209 F.Supp.2d 1029, 1033-34 (N.D. Cal. 2002) (removal of employment discrimination claim proper when lost wages at time of removal were only $25,600 because potential for punitive damages and attorneys fees satisfied $75,000 minimum).

22. The employment claims alleged here are of the type that have resulted in jury verdicts in excess of $75,000. Plaintiff alleges causes of action for (i) disability discrimination; and (ii) wrongful termination. See Bollinger Decl. ¶ 2, Exh. A at ¶¶ 16-26. Plaintiff also seeks statutory attorneys fees and punitive damages. Id. at 5. Awards in other disability discrimination claims show the amount in controversy requirement is met, especially when the potential for attorneys fees and

---

[3] A defendant may make the requisite showing by setting forth additional facts in declarations of knowledgeable company officials. See United Computer Systems, Inc. v. AT&T Corp., 298 F.3d 756, 763 (9th Cir. 2002).

punitive damages is taken into account.[4] See Martin v. Arrow Electronics, USDC for Central District of California Case No. SACV041134JVS (June 12, 2006) ($1 million in lost wages, plus punitive damages, awarded to plaintiff alleging wrongful termination and disability discrimination for panic disorder); Roby v. McKesson HBOC, Yolo County Superior Court Case No. CV01573 (May 3, 2004) ($19,014,000 verdict for disability discrimination and wrongful termination due to plaintiff's panic disorder); Czarnik v. Illumina, Inc., San Diego County Superior Court Case No. GIC763972 (July 16, 2002) (plaintiff awarded $2,196,935 plus punitive damages and attorney fees for discrimination and wrongful discharge due to mental disability); DFEH v. County of Tulare, Unknown County Court Case No. E98-99H-012000 (defendant settled claim for disability discrimination related to plaintiff's mental disability for $425,000).

23. **Venue**. The United States District Court for the Southern District of California is the judicial district embracing the place where Case No. 37-2007-00074151-CU-WT-CTL was filed by Plaintiff and is therefore the appropriate court for removal pursuant to 28 U.S.C. § 1441(a).

WHEREFORE, ConocoPhillips requests that the above action now pending against it in the Superior Court of California, County of San Diego, be removed therefrom to this Court.

Dated: October 29, 2007

AKIN GUMP STRAUSS HAUER & FELD LLP
Catherine A. Conway
Julia I. De Beers
Jeremy F. Bollinger

By [signature]
Jeremy F. Bollinger
Attorneys for Defendant
ConocoPhillips Company

---

[4] For the Court's convenience, true and correct copies of the Westlaw Jury Verdict reports are attached as Exhibits D to the Bollinger Declaration.

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **DEFENDANT CONOCOPHILLIPS COMPANY'S NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441(A), 1446** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan
[Print Name of Person Executing Proof]

[Signature]

EXHIBIT A
PAGE 13

# Exhibit 2

Exhibit 2

EXHIBIT A

PAGE 14

CATHERINE A. CONWAY (SBN 98266)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiffs,<br><br>v.<br><br>CONOCOPHILLIPS COMPANY AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No.<br><br>**DECLARATION OF JEREMY F. BOLLINGER IN SUPPORT OF DEFENDANT CONOCOPHILLIPS COMPANY'S NOTICE OF REMOVAL OF ACTION**<br><br>(San Diego Superior Court, Case No. 37-2007-00074151-CU-WT-CTL) |

# DECLARATION OF JEREMY F. BOLLINGER

I, Jeremy F. Bollinger, certify and declare as follows:

1. I am an attorney at law duly licensed to practice in the Southern District of California and an associate with the law firm of Akin Gump Strauss Hauer & Feld LLP, attorneys of record for Defendant ConocoPhillips in this action. I have personal knowledge of the facts stated herein, and if called and sworn as a witness, I would and could testify competently under oath thereto. I submit this declaration in support of ConocoPhillips Company's Notice of Removal of Action Pursuant to 28 U.S.C. §§ 1332, 1441(a), 1446.

2. On August 27, 2007, a complaint was filed against ConocoPhillips in the San Diego County Superior Court entitled Michael D. Dowd v. ConocoPhillips and ConocoPhillips Marine, Case No. 37-2007-00074151-CU-WT-CTL. On September 25, 2007, ConocoPhillips signed and returned the Notice and Acknowledgement of Service that accompanied a copy of the complaint and summons sent by Plaintiff Michael Dowd.

3. Attached hereto as Exhibit A is a true and correct copy of the Summons, Complaint, and the signed Notice and Acknowledgement of Service.

4. Attached hereto as Exhibit B is a true and correct copy of the Notice of Case Assignment served with the Summons and Complaint.

5. Attached hereto as Exhibit C is a true and correct copy of ConocoPhillips' Answer to Plaintiff's Complaint filed in San Diego Superior Court on October 29, 2007.

///

///

///

///

///

///

///

///

EXHIBIT A

PAGE 16

6. Attached hereto as Exhibit D are true and correct copies of the Westlaw Reports on the Jury Verdict in Martin v. Arrow Electronics, USDC for Central District of California Case No. SACV041134JVS (June 12, 2006); Roby v. McKesson HBOC, Yolo County Superior Court Case No. CV01573 (May 3, 2004); Czarnik v. Illumina, Inc., San Diego County Superior Court Case No. GIC763972 (July 16, 2002); DFEH v. County of Tulare, Unknown County Court Case No. E98-99H-012000.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 29th day of October, 2007, in Los Angeles, California.

Jeremy F. Bollinger





EXHIBIT A
PAGE 17

# Exhibit A

Exhibit A

EXHIBIT A

PAGE 18

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED
CIVIL BUSINESS OFFICE 10
CENTRAL DIVISION

2007 AUG 27 P 2:03

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

NOTICE TO DEFENDANT:
*(AVISO AL DEMANDADO):*
CONOCOPHILLIPS AND CONOCOPHILLIPS MARINE

YOU ARE BEING SUED BY PLAINTIFF:
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MICHAEL D. DOWD

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SAN DIEGO COUNTY SUPERIOR COURT, 330 WEST BROADWAY, SAN DIEGO, CA 92101

CASE NUMBER: 37-2007-00074151-CU-WT-CTL
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JOEL C. GOLDEN, 2356 MOORE STREET, SUITE 201, SAN DIEGO, CA 92110 (619) 294-7918

DATE: AUG 2 7 2007 Clerk, by K Brown, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

JOEL C. GOLDEN (#47904)
2356 Moore St., Suite 201
San Diego, CA 92110
Tel: 619-294-7918
Fax: 619-296-8229

Attorney for PLAINTIFF MICHAEL D. DOWD

FILED
CIVIL BUSINESS OFFICE 10
CENTRAL DIVISION
2007 AUG 27 P 2:03
CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO – CENTRAL DIVISION**

MICHAEL D. DOWD,

Plaintiff,

vs.

CONOCOPHILLIPS AND CONOCOPHILLIPS MARINE,

Defendants.

Case No.: 37-2007-00074151-CU-WT-CTL

**PLAINTIFF'S COMPLAINT FOR DAMAGES FOR:**

**1) DISABILITY DISCRIMINATION IN VIOLATION OF CAL. GOV. CODE § 12940(a); AND**

**2) WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLCIY; AND**

**JURY TRIAL DEMANDED**

Michael D. Dowd ("PLAINTIFF") through his attorney Joel C. Golden, for his Complaint against ConocoPhillips and ConocoPhillips Marine ("DEFENDANTS") alleges as follows:

**PARTIES**

1) At all times material, PLAINTIFF was a resident of the County of San Diego, State of California and DEFENDANTS' employee as that term is defined in California Government Code Section 12926.

2) PLAINTIFF began working for Arco in 1978 and began working for DEFENDANTS in 2000 in the same position as AB Seaman when DEFENDANTS acquired Arco.

3) At all times material, DEFENDANTS' corporate headquarters was located at 600 North Dairy Ashford, TN 6013, Houston, Texas 77079-1175 and DEFENDANTS were doing business in the County of San Diego, where all of the alleged actions occurred.

4) At all times material, upon information and belief, Russ Oechsel, Jr. John Pitts and Chris Bulera were the agents and/or employees of DEFENDANTS and were at all times herein mentioned acting within the scope of said agency and employment. PLAINTIFF further alleges that each DEFENDANT gave consent to, ratified, and authorized the acts alleged herein of each of these individuals.

5) At all times material PLAINTIFF was a qualified person with a disability in that he could perform the essential functions of the job with or without accommodation.

6) PLAINTIFF, at all times material, suffered from a mental disability diagnosed by his physician, Nagmo Fatakhova, M.D., as Panic Disorder, Phobia of Flying, and Bipolar Disorder, type II.

7) At all time material DEFENDANTS were aware of PLAINTIFF'S disability and the fact that due to said disability he could not fly in an airplane for over five hours at a time.

8) In early March, 2007 DEFENDANTS informed PLAINTIFF that his assignment was to work on the ship, Polar California, while it was sailing to Singapore and that he would then fly back from Singapore to the United States on a flight that would last over twenty hours.

9) Upon learning of that assignment PLAINTIFF informed DEFENDANTS that he could not accept the assignment due to his disability which prevented him from flying for more than five hours at a time and requested accommodations such as a re-assignment to a different ship, a non-direct flight or a new job.

10) DEFENDANTS requested a letter from PLAINTIFF'S physician confirming the disability which letter, dated May 19, 2007, PLAINTIFF provided.

11) On March 28, 2007 DEFENDANTS informed PLAINTIFF that because he could not accept the assignment on the Polar California and fly back that he was being suspended immediately and during the ensuing 30 days consideration would be given to possible ways to accommodate his restrictions.

12) During the ensuing 30 days (March 28, 2007-April 28, 2007) DEFENDANTS made no effort to accommodate PLAINTIFF nor did they engage in the interactive process with him.

13) On May 10, 2007 DEFENDANTS informed PLAINTIFF in writing that they had received the March 19, 2007 letter from PLAINTIFF'S physician specifying and confirming his disability and that they were unable to accommodate him so his employment had been terminated as of April 28, 2007.

14) Throughout his employment PLAINTIFF performed his work and job assignments in a competent manner.

15) PLAINTIFF timely filed a DFEH Complaint of discrimination against DEFENDANTS and obtained a Right To Sue Notice prior to filing this action.

**FIRST CAUSE OF ACTION**

**DISABILITY DISCRIMINATION**

**IN VIOLATION OF CALIFORNIA GOVERNMENT CODE SECTION 12940(a)**

16) PLAINTIFF hereby realleges and incorporates by reference herein each and every preceding paragraph of this complaint.

17) At all times material California Government Code Section 12940(a) was in full force and effect and applicable to DEFENDANTS.

18) DEFENDANTS' actions constituted unlawful discrimination against PLAINTIFF, in violation of the above-mentioned statute because he was discriminated against in the terms and conditions of his employment by being suspended and thereafter

terminated because of his disability.

19) DEFENDANTS refused to make reasonable accommodations for PLAINTIFF and further refused to engage in the interactive process with him.

20) As a direct and proximate result of DEFENDANTS' actions and omissions PLAINTIFF has suffered loss of wages and benefits, emotional distress, pain and suffering, humiliation and embarrassment for which DEFENDANTS are liable.

21) DEFENDANTS' actions were fraudulent, malicious and oppressive thereby justifying an award of punitive damages in accordance with California Civil Code Section 3294.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANTS as more fully set forth below.

**SECOND CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

22) PLAINTIFF hereby realleges and incorporates by reference herein each and every preceding paragraph of this complaint.

23) At all times material California Government Code Section 12920 declared that there is a public policy in place in California that assures people that they can seek, maintain and hold employment without discrimination based upon disability.

24) DEFENDANTS' actions in terminating PLAINTIFF violated California's public policy prohibiting discrimination based upon disability.

25) As a direct and proximate result of DEFENDANTS' actions PLAINTIFF has suffered loss of wages and benefits, emotional distress, physical pain and suffering, humiliation and embarrassment for which DEFENDANTS are liable.

26) The above-stated actions were fraudulent, malicious and oppressive thereby justifying an award of punitive damages against DEFENDANTS pursuant to California Government Code Section 3294.

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANTS as more fully set forth below.

**WHEREFORE**, PLAINTIFF prays that this Court grant him the following relief:

1. Judgment against all DEFENDANTS and in favor of PLAINTIFF on all counts of the Complaint;

2. Compensatory damages in an amount according to the proof against all DEFENDANTS;

3. Punitive damages in an amount according to the proof against all DEFENDANTS;

4. Reasonable attorney's fees and costs; and

5. Any and all such other relief as the Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY TRIAL**

DATED: 8/22/07 BY: [signature]

Joel C. Golden
Attorney for Plaintiff Michael D. Dowd

POS-015

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Joel C. Golden (SBN 47904)
2356 Moore Street, Suite 201
San Diego, CA 92110

TELEPHONE NO.: 619-294-7918 FAX NO. (Optional): 619-296-8229
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Michael Dowd (Plaintiff)

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS:
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Central

PLAINTIFF/PETITIONER: Michael Dowd
DEFENDANT/RESPONDENT: ConocoPhillips

NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL

CASE NUMBER: 37-2007-00074151

TO (insert name of party being served): CONOCOPHILLIPS COMPANY

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: ~~8-5-07~~ Sept 5, 2007 as confirmed by J. Golden

JOEL C. GOLDEN
(TYPE OR PRINT NAME)

[signature]
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. ☑ A copy of the summons and of the complaint.
2. ☑ Other (specify):

NOTICE OF CASE ASSIGNMENT
NOTICE TO LITIGANTS
STIPULATION RE ADR

(To be completed by recipient):

Date this form is signed:

9/25/2007
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

[signature]
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
ATTORNEY FOR DEFENDANT CONOCOPHILLIPS COMPANY



American LegalNet, Inc.
www.USCourtForms.com

EXHIBIT A
PAGE 25

# Exhibit B

Exhibit B

EXHIBIT A

PAGE 26

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY AND ZIP CODE: San Diego, CA 92101<br>BRANCH NAME: Central<br>TELEPHONE NUMBER: (619) 685-6151 | |
| PLAINTIFF(S) / PETITIONER(S): Michael D. Dowd | |
| DEFENDANT(S) / RESPONDENT(S): Conocophillips et.al. | |
| DOWD VS. CONOCOPHILLIPS | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2007-00074151-CU-WT-CTL |

Judge: Kevin A. Enright

Department: C-72

**COMPLAINT/PETITION FILED:** 08/27/2007

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING



EXHIBIT A

PAGE 27

# Exhibit C

Exhibit C

EXHIBIT A

PAGE 28

**AKIN GUMP STRAUSS HAUER & FELD LLP**
CATHERINE A. CONWAY (SBN 98366)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiff,<br><br>v.<br><br>CONOCOPHILLIPS AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No. 37-2007-00074151-CU-WT-CTL<br><br>[Hon. Kevin A. Enright]<br><br>**DEFENDANT CONOCOPHILLIPS COMPANY'S ANSWER TO PLAINTIFF MICHAEL D. DOWD'S UNVERIFIED COMPLAINT**<br><br>[Notice to Adverse Parties and Notice to Superior Court of Filing of Removal filed concurrently herewith]<br><br>Date Action Filed: August 27, 2007 |

EXHIBIT A
PAGE 29

6147253

Defendant ConocoPhillips Company ("ConocoPhillips") answers the unverified Complaint ("Complaint") of plaintiff Michael D. Dowd ("Plaintiff"), as follows:

## GENERAL DENIAL

Pursuant to section 431.30(d) of the California Code of Civil Procedure, ConocoPhillips generally denies each and every allegation of Plaintiff's unverified Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

(Failure to State a Claim)

ConocoPhillips is informed and believes, and on that basis alleges, that the Complaint fails to state facts sufficient to constitute any cause of action against ConocoPhillips.

### Second Affirmative Defense

(Statute of Limitations)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred by the applicable statute of limitations.

### Third Affirmative Defense

(Failure to Exhaust Administrative Remedies)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred to the extent Plaintiff failed to exhaust his administrative remedies.

### Fourth Affirmative Defense

(At-Will Employee)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff is barred from any recovery in this action because Plaintiff's employment relationship with ConocoPhillips was governed by California Labor Code section 2922 and, therefore, terminable-at-will.

EXHIBIT A

PAGE 30

**Fifth Affirmative Defense**

(Legitimate Non-Discriminatory Actions)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff is barred from any recovery in this action because all of ConocoPhillips actions toward Plaintiff were taken for legitimate non-discriminatory, non-retaliatory reasons.

**Sixth Affirmative Defense**

(Justification and Privilege)

ConocoPhillips is informed and believes, and on that basis alleges, that the conduct of ConocoPhillips as alleged in the Complaint was justified and privileged under the circumstances.

**Seventh Affirmative Defense**

(Consent)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff consented to the alleged conduct of ConocoPhillips that is the subject of the Complaint.

**Eighth Affirmative Defense**

(Waiver)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred, in whole or in part, in that Plaintiff, by his acts, conduct and omissions, expressly or impliedly waived whatever rights he may have had against ConocoPhillips.

**Ninth Affirmative Defense**

(Estoppel)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff is estopped from asserting any claim against ConocoPhillips by reason of his own acts and omissions upon which ConocoPhillips relied to its detriment.

EXHIBIT A

**Tenth Affirmative Defense**

(Avoidable Consequences)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff is barred from any recovery in this action because he failed to take reasonable steps to avoid the injuries he purportedly suffered in that, among other things, he unreasonably failed to utilize ConocoPhillips' internal complaint procedures.

**Eleventh Affirmative Defense**

(Reasonableness and Good Faith)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff is barred from any recovery in this action because ConocoPhillips and its agents acted reasonably and in good faith at all times material herein, based on all relevant facts and circumstances known by them at the time they so acted.

**Twelfth Affirmative Defense**

(Failure to Mitigate)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred, in whole or in part, to the extent Plaintiff failed to mitigate the injury or damages alleged in the Complaint.

**Thirteenth Affirmative Defense**

(Unclean Hands)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

EXHIBIT A

PAGE 32

**Fourteenth Affirmative Defense**

(After-Acquired Evidence)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's claims are barred by the after-acquired evidence doctrine.

**Fifteenth Affirmative Defense**

(Inability To Perform Essential Job Duty)

ConocoPhillips is informed and believes, and on that basis alleges, that its conduct was lawful because Plaintiff was unable to perform an essential job duty even with reasonable accommodations

**Sixteenth Affirmative Defense**

(Health and Safety)

ConocoPhillips is informed and believes, and on that basis alleges, that its conduct was lawful because, even with reasonable accommodations, Plaintiff was unable to perform an essential job duty without endangering his health and safety or the health and safety of others.

**Seventeenth Affirmative Defense**

(Undue Hardship)

ConocoPhillips is informed and believes, and on that basis alleges, that Plaintiff's proposed accommodations would create an undue hardship to the operation of ConocoPhillips' business.

**RESERVATION OF RIGHTS**

ConocoPhillips hereby gives notice that it intends to rely upon such other and further affirmative defenses as may become available during discovery in this action and reserves the right to amend its Answer to assert any such defenses.

EXHIBIT A

PAGE 33

WHEREFORE, ConocoPhillips prays for judgment in its favor and requests that the Court:

1. Dismiss the Complaint with prejudice;

2. Award ConocoPhillips its reasonable attorneys' fees and costs of suit; and

3. Grant ConocoPhillips such other relief as may be appropriate.

Dated: October 29, 2007

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Catherine A. Conway
Julia I. De Beers
Jeremy F. Bollinger

By ______________________
Jeremy F. Bollinger
Attorneys for Defendant
ConocoPhillips Company

EXHIBIT A
PAGE 34

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **DEFENDANT CONOCOPHILLIPS COMPANY'S ANSWER TO PLAINTIFF MICHAEL D. DOWD'S UNVERIFIED COMPLAINT** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel.: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (STATE) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan
[Print Name of Person Executing Proof]

[signature]
[Signature]

EXHIBIT A
PAGE 35

6147253

# Exhibit D

Exhibit D

EXHIBIT A

PAGE 36

29 Trials Digest 9th 14 (C.D.Cal.), 2006 WL 2044626
For Dockets See 8:04cv01134

Copyright (c) 2007 Thomson/West

United States District Court, C.D. California, Southern Division.

Martin vs. Arrow Electronics

TOPIC:
Synopsis: Company fails to accommodate employee's disability
Case Type: Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Disability/Medical Condition; Labor & Employment; Violation of Public Policy

DOCKET NUMBER: SACV041134JVS

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: June 12, 2006

JUDGE: James V. Selna

ATTORNEYS:
Plaintiff: Lance Green, Law Offices of Lance Green, Beverly Hills.; Anthony Lanza, Lanza & Goolsby, Irvine.
Defendant: Gerald Griffin, Gibbs, Giden, Locher & Turner, Los Angeles.; Gary Scalabrini, Gibbs, Giden, Locher & Turner, Los Angeles.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $1,500,000

Range: $1,000,000-$1,999,999

The jury concluded that defendant wrongfully terminated plaintiff based upon the disabilities he developed during his four-year employment and that the company failed to offer him a reasonable accommodation for his disabilities pursuant to the Fair Employment & Housing Act, which is California's parallel statute to the Americans with Disabilities Act. The jury's award included over $1 million in lost wages, plus punitive damages based upon a finding that defendant's misconduct constituted fraud, oppression, or malice.
Trial Type: Jury

EXHIBIT A
PAGE 37

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Trial Length: 2 weeks.
Deliberations: 1 day.
Jury Poll: Not reported.

EXPERTS:
Other: Dominick Addario M.D., psychiatrist, San Diego, (619) 295-2189.
Deborah Dickson C.P.A., certified public accountant, Irvine, (949) 553-1020.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: Plaintiff Douglas Martin was a general manager at defendant Arrow Electronics, based in Melville, New York, in charge of roughly 50 employees involved in the distribution of electric components. He was a top performer at Arrow until he became disabled in 2001, at which time he was terminated while on disability leave under the guise of a layoff. Plaintiff alleged that his employment was terminated based upon progressively worsening and disabling ailments, including anxiety disorder, **panic** attacks, **panic** disorder without agoraphobia, and, ultimately, **panic** disorder with agoraphobia. Plaintiff alleged that defendant manufactured an explanation for his termination while he was on a leave of absence after having suffered a severe **panic** attack and proceeded to terminate him based on his psychiatric disabilities.
Plaintiff further alleged that defendant's misconduct contributed significantly to his deteriorating health, specifically including the decision by defendant's HR to send notice of termination while he was in a particularly vulnerable psychiatric state, despite explicit advance warning from his psychologist and despite a failure to make any effort to accommodate plaintiff's known disabilities.
Plaintiff generally alleged that defendant's conduct constituted **disability discrimination** pursuant to the California Fair Employment and Housing Act (FEHA) and failure to reasonably accommodate a disability under FEHA.
Defendant denied that the termination of plaintiff's employment was the result of any discriminatory or unlawful action. Plaintiff was laid off as part of a corporate re-organization by defendant. During the year that plaintiff was laid off, defendant eliminated 930 positions, or eight percent of its worldwide personnel, as part of a restructuring of operations. In the case of plaintiff, his job was allegedly eliminated after two of defendant's operating units were integrated. Due to the integration, the managerial assignments of several operating units, including Arrow Bell Components, were changed. Based on his qualifications, Peter Ainsworth was assigned as the general manager of Arrow Bell Components for the San Jose market. Defendant contended that, ultimately, the decision to lay off plaintiff was a just and proper exercise of management discretion on the part of Arrow, undertaken for a fair and honest reason and regulated by good faith.

CLAIMED INJURIES
According to Plaintiff: Exacerbation of emotional distress.

CLAIMED DAMAGES
According to Plaintiff: $607,385 past lost earnings; $547,194 future lost earnings; $41,000 past medical; $24,000 future medical; $300,000 past physical pain and mental suffering; $1,000 punitive damages.

SETTLEMENT DISCUSSIONS

EXHIBIT A
PAGE 38

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to Plaintiff: Not reported.

COMMENTS

According to Plaintiff:

According to plaintiff's counsel, this was the largest reported employment verdict in Orange County this year, including state and federal filings for wrongful termination, discrimination, and labor disputes. It was also the second largest federal verdict on Orange County this year and the fourth largest verdict of any type in Orange County, federal or state.

Trials Digest, A Thomson/West business

Central District Federal Court/Santa Ana

29 Trials Digest 9th 14 (C.D.Cal.), 2006 WL 2044626

END OF DOCUMENT

EXHIBIT A

PAGE 39

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

24 Trials Digest 7th 4 (Cal.Superior), 2004 WL 1385971

Copyright (c) 2007 Thomson/West

Superior Court, Yolo County, California.

Roby vs. McKesson HBOC

TOPIC:
Synopsis: Employee sues for wrongful discharge in violation of public policy
Case Type: Employment; Termination; Violation of Public Policy; Employment; Disability/Medical Condition; Employment; Termination; Discriminatory; Fair Employment and Housing Act; Employment; Harassment

DOCKET NUMBER: CV01573

STATE: California
COUNTY: Yolo

Verdict/Judgment Date: May 3, 2004

JUDGE: Timothy L. Fall

ATTORNEYS:
Plaintiff: David deRubertis, The deRubertis Law Firm, Woodland Hills.; Christopher H. Whelan, Law Offices of Christopher H. Whelan, Gold River.
Defendant: Phillip E. Drysdale, Baum & Weems, Dublin.; Sarah Robertson, Fitzgerald, Abbott & Beardsley, Oakland.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $19,014,000

Range: $5,000,000-$999,999,999

Against defendant McKesson HBOC: $605,000 past economic loss; $706,000 future economic loss; $2,200,000 emotional distress; $15,000,000 punitive damages. Against defendant Schoener: $500,000 emotional distress; $3,000 punitive damages.
Trial Type: Jury
Trial Length: 17 days.
Deliberations: 1 day.
Jury Poll: Not reported.

EXPERTS:

EXHIBIT A
PAGE 40

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff: Charles R. Mahla, Ph.D., economist, Econ One Research, Inc., Sacramento, (916) 449-2860.; Joseph S. Schnitzler, psychiatrist, Vacaville, (707) 451-0182.

FOR RELATED TRIAL DOCUMENTS SEE:
Complaint for Damages 1) **Wrongful Termination** (Breach of Contract) 2) **Wrongful Termination** (Public Policy Violation) 3) Disability Discrimination, Harassment, Retaliation, Failure to Meet and Confer and Failure Accommodate 4) Defamation: 2001 WL 34786828
Defendants' Answer to Plaintiff's Unverified Complaint for Damages: 2001 WL 34786829
Defendants' Trial Brief: 2004 WL 3363527
Defendants' Proposed Jury Instructions: 2004 WL 3362056

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: A long-time McKesson employee sued the company and her supervisor for wrongful discharge in violation of public policy. The plaintiff was Charlene J. Roby. The defendants were McKesson HBOC and Karen Schoener. Plaintiff was a 25-year employee of McKesson, the largest drug distribution company in the United States, holding the 16th position on the Fortune 500 list for revenue (2003 revenues: $57 billion). At the time of her termination, plaintiff worked as a customer service liaison in McKesson's West Sacramento distribution center. Her performance had always been excellent, as confirmed by every defense witness. The reason stated for her termination was that she missed 10 days from work over a 14-month period for which she was not able to give management 24 hours warning. These absences were held against her under McKesson's 'no fault' policy, even though plaintiff used her vacation time and sick time to cover them. Most of the absences were the result of uncontrollable panic attacks for which plaintiff had no forewarning. McKesson was well aware of plaintiff's panic attack condition, which was diagnosed in 1997. She had doctor's certifications excusing certain absences and letters regarding this condition in her personnel file before her termination. In early 1999, defendant Schoener became plaintiff's supervisor and began harassing her because of her condition. For the first 24 years of her career at McKesson, plaintiff had good attendance and an exemplary work record. She received stellar performance reviews from all of her supervisors, even from Schoener and Alan Grover, the managers responsible for her firing. McKesson's management and employees testified that before 1999 plaintiff did not have any attendance problems. In 1999, as a result of Schoener's harassment, plaintiff's panic disorder took a turn for the worse. She began to suffer more frequent and severe panic attacks, causing her to break out in profuse sweating and to pick and scratch at her arms.
Witnesses described plaintiff's arms as a mass of scabs, sores, and scars. They also described plaintiff's sweating as so severe that, at times, her hair looked like she had just stepped out of a shower. Because of the panic attacks, plaintiff missed an occasional day, averaging less than one per month in the last year before McKesson fired her. But, under McKesson's 'no fault' attendance policy, employees' unplanned absences were punished harshly, even in those instances in which an employee, such as plaintiff, would use her sick time or vacation time to cover the absence. After receiving a 'final written warning' in October 1999, plaintiff testified that Schoener told her she would have a 'clean slate' if she made it to January 18, 2000 without any more unscheduled absences, which she did. But, when plaintiff missed two more days in 2000, McKesson fired her. McKesson's management

EXHIBIT A

admitted that even under its 'no fault' policy, it could not have fired plaintiff if her last absence had occurred only one week later. No consideration or grace period was granted to plaintiff, who had performed excellently for 25 years, for the confusion that her manager's misinformation may have caused.
Under a 'no fault' attendance policy such as McKesson's, unscheduled absences are punished regardless of the reason for the absence or whether the employee uses vacation or sick time to cover the absence. It is well known to human resource professionals that rigid use of 'no fault' attendance policies often violates state and federal laws guaranteeing employees medical leave when needed and protection against **disability discrimination**. McKesson did not train its management or human resource employees in how to make sure its 'no fault' policy was not applied in a way that violated state and federal law. The evidence showed that McKesson's managers applied its 'no fault' policy in different ways to different employees.
McKesson's witnesses and managers testified at trial that they still had not received any additional training on state and federal disability and medical leave laws, even after three years of litigation challenging McKesson's 'no fault' policy, and that McKesson had no intentions of providing this training. McKesson also had no concern as to what would happen to plaintiff as a result of her termination, and it was not concerned enough about disabled employees' rights to obtain any training regarding California Family Rights Act (CFRA) or Fair Employment and Housing Act (FEHA) disability rights.
McKesson's attendance policy was set up to allow each manager to interpret and apply the confusing policy as he saw fit. This led to abuses and favoritism. Schoener did not know what CFRA or disability rights were, and even up to the time of trial she had not had training in those areas. McKesson's distribution center manager, Alan Grover, who made the ultimate decision to terminate plaintiff, also admittedly did not understand CFRA or disabled employees' rights under California law, and he had no plans to obtain any training in those areas. Grover believed that CFRA rights were available only to pregnant women.
McKesson's initial defense appeared to be that plaintiff was such an excellent employee that they did not know that she was disabled. However, they admittedly knew that she had a panic disorder and was receiving ongoing treatment for it. McKesson shifted its defense to claim that it did not know that the absences were related to plaintiff's panic disorder and that she did not provide them with the required information for medical leave. Plaintiff's personnel file included notes from her psychiatrist excusing some of the absences that led to her firing and other notes advising management of plaintiff's chronic panic disorder, its treatment, and medications used to control it. Another excuse that McKesson gave for not providing plaintiff protection under CFRA and FMLA was, according to the distribution center manager, that plaintiff had to use 'magic words' to effectively request CFRA or FMLA leave. However, McKesson managers admitted that neither these 'magic words' nor any similar requirements or procedures were disclosed either in writing or orally to employees.
The jury was instructed that no 'magic words' had to be used for an employee to obtain CFRA leave. The employee only had to provide information that would cause a reasonable employer to suspect that there was a connection between the absences and the condition. McKesson's managers testified that they took no steps to find out if this was true, even after plaintiff provided written notice that her absences were caused by her disability. They admittedly did not ask plaintiff or her doctor about what caused the absences. They testified that they had no concern as to the cause of plaintiff's absences or whether the firing would be emotionally and financially devastating to plaintiff, a single mother with two children. Plaintiff testified that since her termination she has become terrified of people and crowds and her world has become the four walls of her bedroom. Plaintiff had lived in the

EXHIBIT A
PAGE 42

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sacramento area her whole life, but was forced to move to Oregon to be with relatives in order to survive. She has been unemployed and totally disabled since her termination.
The jury found that Schoener harassed plaintiff and that she was terminated on April 14, 2000 because of her mental disability in violation of her rights under the CFRA, FMLA, and disability protection under the Fair Employment and Housing Act. The jury found that McKesson's conduct was malicious and that upper management at McKesson ratified and approved the harassment, illegal firing, and denial of plaintiff's needed medical leave.

CLAIMED INJURIES
According to Plaintiff: Severe emotional distress; self-mutilation; agoraphobia leading to total disability.

CLAIMED DAMAGES
According to Plaintiff: Past and future wage loss; past and future emotional distress; punitive damages.

SETTLEMENT DISCUSSIONS
According to Plaintiff: McKesson offered to settle for $10,000. Plaintiff made no counter-offer and merely said, 'we obviously see this case differently.'

EXPERT TESTIMONY
According to Plaintiff: Plaintiff's psychiatrist, Dr. Schnitzler, testified that the emotional trauma from the firing was career ending and caused plaintiff's agoraphobia, which left her totally disabled.

COMMENTS
According to Plaintiff: Plaintiff's attorney reported that this was the largest verdict in California history for this type of case. Defendants intend to file post-trial motions and an appeal if necessary. Christopher H. Whelan provided the information for this report.

Trials Digest, A Thomson/West business

Yolo County Superior Court

24 Trials Digest 7th 4 (Cal.Superior), 2004 WL 1385971

END OF DOCUMENT

EXHIBIT A
PAGE 43

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Trials Digest 6th 4 (Cal.Superior), 2002 WL 31961635

Copyright (c) 2007 Thomson/West

Superior Court, San Diego County, California.

Czarnik vs. Illumina, Inc.

TOPIC:
Synopsis: Chief scientific officer of biotech company wins large award for employment discrimination
Case Type: Employment; Termination; Discriminatory; Employment; Retaliation; Employment; Termination; Violation of Public Policy

DOCKET NUMBER: GIC763972

STATE: California
COUNTY: San Diego

Verdict/Judgment Date: July 16, 2002

JUDGE: Ronald S. Prager

ATTORNEYS:
Plaintiff: Anthony F. Pantoni, Law Office of Anthony F. Pantoni, San Diego.
Defendant: Noemi C. Espinosa, Illumina, Inc./Intel Prop, San Diego.; Jennifer A. Kearns, Brobeck Phleger & Harrison LLP, San Diego.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $7,196,935

Range: $5,000,000-$999,999,999

After deliberating for one and one-half days, the jury returned a verdict in favor of plaintiff in the liability and compensatory phase of the trial and awarded him $2,196,935. The jury also found that defendant acted with malice, and after another half day of deliberations, the jury awarded plaintiff $5,000,000 in punitive damages. Plaintiff was also awarded $325,000 in attorney fees.
Trial Type: Jury
Trial Length:
Deliberations: 1.5 days.
Jury Poll: Not reported.

EXHIBIT A
PAGE 44

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXPERTS:
Plaintiff: Brian P. Brinig CPA, J.D., economist, Brinig & Company, San Diego, (619) 687-2600.
Defendant: Michael P. Ward Ph.D., economist, Welch & Associates, Santa Monica, (310) 393-5530.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: A chief scientific officer sued his employer for discrimination and wrongful discharge. The plaintiff was Anthony W. Czarnik. The defendant was Illumina, Inc. In the summer of 1998, plaintiff and others founded defendant Illumina, Inc., a biotechnology company that developed tools to analyze genes. In 1999, plaintiff, who was serving as the chief scientific officer, disclosed to the management that he suffered from depression. Plaintiff alleged that after he disclosed his illness to the company officials, he was left out of management strategy meetings and was excluded from significant business activities. After complaining to management that he had been discriminated against, and later filing a complaint with the Department of Fair Employment and Housing, plaintiff alleged that he was retaliated against, by, among other things, being placed on a performance plan and assigned unreasonable performance goals. Plaintiff alleged that he then began to verbalize strong concerns about an important experiment that the company was conducting to the effect that information derived from this experiment should not be used on its 'road show' presentations to potential investors during its initial public stock offering. On September 5, 2000, plaintiff was terminated. Plaintiff alleged that he was discriminated against after he disclosed his mental disability (depression) to defendant's management. When he complained of discrimination and ostracization, plaintiff maintained that defendant retaliated against him. Finally, plaintiff alleged that, in part, defendant terminated his employment in violation of public policy because he raised his concerns to company management about the use or planned use of information/conclusions derived from an experiment that would mislead potential investors.
Defendant denied all of plaintiff's allegations. Defendant maintained that in February 2000, plaintiff offered to step down from the CSO position and to assume the position of research fellow, which was an individual contributor position lacking the management responsibilities he previously held. Defendant contended that after accepting the research fellow position, plaintiff resigned and began trying to negotiate a severance package. After these negotiations reached a standstill, plaintiff for the first time voiced his allegations of disability discrimination. Defendant denied any retaliation against plaintiff for voicing his complaint. Finally, with respect to plaintiff's third claim, defendant denied that plaintiff raised any concern about misleading potential investors, and denied that he was terminated in violation of public policy. Defendant contended that plaintiff was terminated for longstanding poor job performance and poor work ethic, and for failing to meet or even attempting to meet individual goals assigned to him. Defendant further denied that there was any evidence of malice whatsoever.

CLAIMED INJURIES
According to Plaintiff: Emotional distress.

CLAIMED DAMAGES

EXHIBIT 4

PAGE 45

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to Plaintiff: $1,700,000 economic damages due to loss of the value of his stock in Illumina; emotional distress damages; and punitive damages.

SETTLEMENT DISCUSSIONS
According to Plaintiff: Demand: $1,500,000. Offer: $200,000.

Trials Digest, A Thomson/West business

San Diego County Superior Court/Central

2 Trials Digest 6th 4 (Cal.Superior), 2002 WL 31961635

END OF DOCUMENT

EXHIBIT A
PAGE 46

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JVR No. 801439 (Unknown State Ct.), 2000 WL 1672184
COPR. (C) 2007 LRP Publications

Unknown State Ct.

DFEH v. COUNTY OF TULARE

E98-99H-012000

No Date Given

TOPIC:

SUMMARY
Outcome: Settlement
Non Verdict Award: $425,000

EXPERT-WITNESSES:

ATTORNEY:

JUDGE:

RANGE AMOUNT: $200,000-499,999

STATE: California
COUNTY: Tulare

SUMMARY
SETTLEMENT TIME: After Filing
PLAINTIFF:
Sex: Female
General Occupation: MIDDLE MANAGEMENT
Occupational Field: Services-Health

PRIMARY STATUTE OR GROUND: Disability Discrimination-State
SECONDARY STATUTE OR GROUND:
GENERAL ENTITY TYPE: Service Industry
SPECIFIC ENTITY TYPE: Health Services
ADVERSE EMPLOYMENT ACTION: Failure to hire or rehire
AMOUNT OF AWARD AFTER STATUTORY LIMIT:
ATTORNEY'S FEES:

FACTS:

EXHIBIT A
PAGE 47

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The plaintiff sued the defendant county on behalf of a female health and services agency manager claiming **disability discrimination** in violation of state laws. The plaintiff alleged that, after she completed a medical leave due to a **mental** disability, she was cleared to return to work by her health care provider, that the defendant refused to allow her to return and that she was placed on retirement. The defendant denied liability and agreed to a settlement.

LRP Publications

COURT:

JVR No. 801439 (Unknown State Ct.), 2000 WL 1672184

END OF DOCUMENT

EXHIBIT A

PAGE 48

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **DECLARATION OF JEREMY F. BOLLINGER IN SUPPORT OF DEFENDANT CONOCOPHILLIPS COMPANY'S NOTICE OF REMOVAL OF ACTION** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan
[Print Name of Person Executing Proof]

David B. Kirvan
[Signature]

EXHIBIT A

PAGE 49

# Exhibit 3

Exhibit 3

EXHIBIT A

PAGE 50

CATHERINE A. CONWAY (SBN 98266)
JULIA I. DE BEERS (SBN 233811)
JEREMY F. BOLLINGER (SBN 240132)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012
Telephone: 310-229-1000
Facsimile: 310-229-1001

Attorneys for Defendant
ConocoPhillips Company

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL D. DOWD,<br><br>Plaintiffs,<br><br>v.<br><br>CONOCOPHILLIPS COMPANY AND CONOCOPHILLIPS MARINE,<br><br>Defendants. | Case No.<br><br>**DECLARATION OF RUSSELL H. OECHSEL, JR. SUPPORT OF DEFENDANT CONOCOPHILLIPS' NOTICE OF REMOVAL OF ACTION**<br><br>(San Diego Superior Court, Case No. 37-2007-00074151-CU-WT-CTI) |

EXHIBIT A

PAGE 51

# DECLARATION OF RUSSEL H. OECHSEL, JR.

I, Russel H. Oechsel, Jr., certify and declare as follows:

1. I am currently employed as ConocoPhillips Company's ("ConocoPhillips") H.R. Generalist. In that position, I am familiar with and have personal knowledge of ConocoPhillips' corporate organization, operations, policy-making procedures, workforce distribution, payroll information, and general business affairs.

2. ConocoPhillips maintains its corporate headquarters at 600 North Dairy Ashford, Houston, Texas 77252-2197. ConocoPhillips' executive and administrative operations are centrally managed from this location. ConocoPhillips also maintains administrative offices in Bartlesville, Oklahoma, but day-to-day control over the Company is executed from the Houston headquarters.

3. The executive officers of ConocoPhillips, including the President, chief financial officer, executive vice-presidents, and general counsel, maintain their offices at ConocoPhillips' headquarters in Houston, Texas.

4. From its headquarters in Texas, ConocoPhillips makes and implements company-wide operating, financial, employee relations, marketing, development, customer care, accounting, income tax, treasury, and legal policy decisions.

5. ConocoPhillips' board room is located in Houston. ConocoPhillips' Board of Directors generally meets in Houston, Washington, D.C., or New York, but meetings have taken place at other locations around the United States and overseas. Stockholders meetings are held in Houston, Texas.

6. ConocoPhillips' financial records are maintained in Texas.

7. ConocoPhillips' tax returns are filed from Bartlesville, Oklahoma.

8. Attached as Exhibit A are true and correct copies of the Certificate of Incorporation of "Phillips Petroleum Company" and the Certificate of Amendment of "Phillips Petroleum Company", Changing its Name to "ConocoPhillips Company".

9. Attached as Exhibit B is a true and correct copy of the Refining and Marketing pages from ConocoPhillips' 2007 Fact Book.

EXHIBIT A
PAGE 52

10. Attached as Exhibit C is a true and correct copy of the Chemicals Sector pages from ConocoPhillips' 2007 Fact Book.

11. Currently, ConocoPhillips employs approximately 20,267 people in the United States. These employees are distributed among its operations in 44 states. The following states are the 10 states in which ConocoPhillips employs the most individuals:

| State | Employees (Approximate) |
|---|---|
| Texas | 6706 |
| Oklahoma | 4474 |
| California | 2581 |
| Louisiana | 1468 |
| Alaska | 1096 |
| New Jersey | 911 |
| Illinois | 910 |
| New Mexico | 863 |
| Washington | 670 |
| Colorado | 611 |

12. ConocoPhillips employs approximately 7,199 people in its twelve refineries, including:

| State (# of refineries) | Employees (Approximate) |
|---|---|
| Texas (2) | 1676 |
| California (2) | 1170 |
| Louisiana (2) | 1081 |
| New Jersey (1) | 860 |
| Illinois (1) | 745 |
| Oklahoma (1) | 695 |
| Pennsylvania (1) | 415 |
| Montana (1) | 288 |
| Washington (1) | 269 |



EXHIBIT A
PAGE 53

13. ConocoPhillips markets its products through approximately 9,076 outlets throughout 49 of the United States, including 1,201outlets in California, 1,032 outlets in Texas, and 944 outlets in Missouri.

14. ConocoPhillips Marine, named as a defendant in this action, is not a separate corporate entity from ConocoPhillips Company.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October October 23, 2007, in Houston, Texas.

Russell H. Oechsel, Jr.

EXHIBIT A

PAGE 54

# Exhibit A

Exhibit A

EXHIBIT A

PAGE 55

# Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "PHILLIPS PETROLEUM COMPANY", CHANGING ITS NAME FROM "PHILLIPS PETROLEUM COMPANY" TO "CONOCOPHILLIPS COMPANY", FILED IN THIS OFFICE ON THE TWELFTH DAY OF DECEMBER, A.D. 2002, AT 1:41 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2002, AT 11 O'CLOCK P.M.

EXHIBIT A
PAGE 56

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

0064324 8100

030621280

AUTHENTICATION: 2656634

DATE: 09-26-03

FROM RL&F#1 (THU)12. 12'02 13:32/ST. 13: P 5

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 01:41 PM 12/12/2002
020763238 – 0064324

# CERTIFICATE OF AMENDMENT

**to the**

# RESTATED CERTIFICATE OF INCORPORATION

**of**

# PHILLIPS PETROLEUM COMPANY

**(to be renamed ConocoPhillips Company)**

Phillips Petroleum Company ("Phillips"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), hereby certifies that:

1. The amendments to Phillips' Restated Certificate of Incorporation set forth below were duly adopted in accordance with the provisions of Section 242 of the DGCL and have been consented to in writing by the sole stockholder of Phillips in accordance with Section 228 of the DGCL.

2. Phillips' Restated Certificate of Incorporation is hereby amended by deleting Article I thereof and replacing in lieu thereof a new Article I reading in its entirety as follows:

> "The name of the corporation (which is hereinafter referred to as the "Corporation") is ConocoPhillips Company."

3. Phillips' Restated Certificate of Incorporation is hereby amended by deleting Section 1 of Article IV thereof and replacing in lieu thereof a new Section 1 reading in its entirety as follows:

> "Section 1. The Corporation shall be authorized to issue 2,100 shares of capital stock, of which 2,100 shares shall be shares of Common Stock, $.01 par value ("Common Stock")."

4. Pursuant to Section 103(d) of the DGCL, this amendment will become effective at 11:00 p.m., Eastern time, on December 31, 2002.

HOU03:884504.1

EXHIBIT A

PAGE 57

IN WITNESS WHEREOF, Phillips has caused this certificate to be executed this 12th day of December, 2002.

PHILLIPS PETROLEUM COMPANY

By: ____________________
Name: Rick A. Harrington
Title: Senior Vice President, Legal, and General Counsel

# Delaware

PAGE 1

The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "PHILLIPS PETROLEUM COMPANY", FILED IN THIS OFFICE ON THE THIRTEENTH DAY OF JUNE, A.D. 1917, AT 9 O'CLOCK A.M.

EXHIBIT A

PAGE 59

Harriet Smith Windsor

Harriet Smith Windsor, Secretary of State

0064324 8100

030252411

AUTHENTICATION: 2371088

DATE: 04-17-03

643-34

CERTIFICATE OF INCORPORATION

OF

P[illegible]LLIPS PETROLEUM COMPANY

RECEIVED AND FILED

JUN 13 1917 9 A.M.

United States Corporation Company
MUTUAL LIFE BUILDINGS,
NEW YORK

EXHIBIT 4

PAGE 60

00001

00372

CERTIFICATE OF INCORPORATION

-of-

PHILLIPS PETROLEUM COMPANY.

- - -

WE, THE UNDERSIGNED, being associated to establish a corporation for the purposes hereinafter set forth, under the General Corporation Laws of the State of Delaware, do hereby make and file a certificate of incorporation in writing certifying:

FIRST: The name of the corporation is PHILLIPS PETROLEUM COMPANY.

SECOND: The principal office of the corporation is to be located in the City of Dover, in the County of Kent, in the State of Delaware; and the name of its resident agent is James H. Satterfield.

THIRD: The nature of the business of the corporation and the objects or purposes proposed to be transacted, promoted or carried on, are:

(a) To carry on the business of buying, selling, or otherwise acquiring, taking, owning, holding, developing, leasing, managing, manufacturing, importing and exporting, utilizing, marketing, trading, dealing in, and otherwise turning to account, any and all kinds and grades of oil and gas, petroleum, asphalt, bitumen

and bituminous substances of all kinds, carbon and hydrocarbon products, and any and all elements, constituents, products, by-products, compounds, blends and combinations thereof;

(b) To purchase, take, hold, own, lease, exchange, or otherwise acquire, and to develop, sell, mortgage, let and deal in gas-bearing, oil-bearing and other mineral-bearing properties, leases, mines, wells and rights, and any and all interest whatsoever therein or thereto, and to engage in the business of producing, mining and selling gas, oil and other minerals;

(c) To purchase, obtain by contract or concession, or otherwise acquire, take, hold, own, develop, explore, exploit, improve, operate, lease, enjoy, control, manage, or otherwise turn to account, mortgage, grant, sell, exchange, deal in, convey, or otherwise dispose of, any and all lands, real estate, leases, concessions, licenses, immunities, powers, privileges, grants, rights, land patents, franchises, deposits, wells, mines, quarries, locations, claims, easements, tenements, hereditaments and interests, of every description and nature whatsoever;

(d) In connection with and incidental to any of the foregoing, to purchase, or otherwise acquire, take, own, hold, mortgage, pledge, create liens upon, convey, sell, lease, enjoy, or otherwise turn to account, assign and transfer, and to invest, trade and deal in goods, wares and merchandise and real and personal property, and to exercise any and all powers connected with or



EXHIBIT A

PAGE 62

relating to each and every of the foregoing businesses;

(e) To construct, build, purchase, lease, or otherwise acquire, take, own, hold, equip, improve, develop, maintain, manage, operate, control, mortgage, create liens upon, deal in, and otherwise dispose of and turn to account, any and all kinds of plants, works, factories, buildings, structures, stores, storehouses, warehouses, houses, extracting plants, waterworks and plants, tanks, reservoirs, containers, pumps, stills, condensers, absorbers, tubes, engines, boilers, turbines, generators, converters, machines and machinery of all kinds, electrical and otherwise, switchboards, meters and all kinds of measuring devices, tools, implements, equipment, apparatus and things or property, real or personal, of every kind and description, cars, tank cars, tanks, pipe lines, transmission lines, distribution lines and plants, mains, pipes, conduits, ducts, services, pumping and compressing stations, terminals, storage plants and equipment, systems, vehicles, however propelled, ships, docks, boats, barges, floats, vessels and craft of any and all kinds, however operated or propelled, docks, wharves, drydocks, repair shops, elevators, piers and any and all facilities, connections, installations, appliances, apparatus, appurtenances, things or property, real and personal, of every kind and description connected with, incidental to, necessary, suitable, useful, convenient or appertaining to the producing, drilling for, mining, manufacturing, buying, acquiring, securing, transporting, refining, reducing, condensing,

evaporating, vaporizing, blending, analyzing, compressing, liquifying, absorbing, cracking, extracting, separating, purifying, combining, mixing, marketing, utilizing, dealing in, storing, or otherwise disposing of and turning to account, oil of any and all kinds and grades, gas, either natural or artificial, gasoline, naptha, alcohol, benzine, kerosene, carbon and hydrocarbon products, nitrates, petroleum, asphalt, bitumen and bituminous substances of all kinds, and the elements, constituents, products and by-products, mixtures, combinations and blends thereof, and for any of the purposes enumerated in this certificate;

(f) To apply for, obtain, register, purchase, lease, acquire, secure, own, hold, use, operate, contract or negotiate for, take licenses or other rights in respect of, sell, transfer, grant licenses and rights in respect of, manufacture under, introduce, sell, assign, collect the royalties on, mortgage, pledge, create liens upon, or otherwise dispose of, deal in and turn to account letters patent, patents, patent rights, patents applied for or to be applied for, trade marks, trade names and symbols, distinction marks and indications of origin or ownership, copyrights, syndicate rights, inventions, discoveries, devices, machines, improvements, processes, data, formulae of any and all kinds granted by or recognized under or pursuant to the laws of the United States of America, or of any other country or countries whatsoever;

(g) To acquire all or any part of the good will, rights, property and business of any person, firm, association or corporation, heretofore or hereafter engaged



EXHIBIT A

PAGE 64

in any business similar to the business of this corporation, and to pay for the same in cash or in stock or bonds of this corporation or otherwise, and to hold, utilize, enjoy and in any manner dispose of the whole, or any part of the rights and property so acquired, and to assume in connection therewith, any liabilities of any such person, firm, association or corporation, and to conduct in any lawful manner and in any country, state or locality herein enumerated, the whole or any part of the business thus acquired, provided such business is within the authorization of the General Corporation Laws of the State of Delaware;

(b) To purchase, own, hold, sell, assign, transfer, mortgage, pledge, create liens upon, or otherwise dispose of, so far as may be done under the laws of the State of Delaware, any of the shares of the capital stock of, or any bonds, debentures, notes, securities or other evidences of indebtedness, created, issued or incurred by any public, municipal, quasi public or private corporations or associations, wherever organized or created, and as owner thereof to exercise all rights, powers and privileges of ownership, including the right to vote upon any stock thus owned; and to aid in any manner which shall be lawful any corporation or association of which any bonds, stocks or other securities or evidences of indebtedness shall be held by this corporation, and to do any acts and things permitted by law and designed to protect, preserve, improve or enhance the value of any such bonds, stocks or other securities



EXHIBIT A

PAGE 65

or evidences of indebtedness;

(i) To have one or more offices and to carry on any and all of its businesses and operations without restriction or limit as to amount, either within or without the State of Delaware, in the other states, the District of Columbia, the territories, colonies and dependencies of the United States of America, and in all or any foreign countries or in any part of the world;

(j) To do all and everything necessary, suitable and proper for the accomplishment of any of the purposes or attainment of any of the objects or exercise of any of the powers herein set forth, whether herein specified or not, either alone or in connection with other firms, individuals or corporations, both in this State and throughout the United States and elsewhere, and to do any other act or acts, thing or things, incidental or appurtenant to or growing out of or connected with said businesses or powers, or any part thereof, if not inconsistent with the laws under which this corporation is organized;

(k) It is declared that the objects and powers specified in the various paragraphs contained in this clause shall be in no wise limited or restricted by reference to or inference from the terms of any other of the paragraphs of this or any other clause of this certificate of incorporation.

FOURTH: The total number of shares authorized to be issued by this corporation is thirty thousand (30,000), all of which shall be without any nominal or par value.

The number of shares with which this corporation will commence business is ten (10).

FIFTH: The names and places of residence of each of the original subscribers to the capital stock and the number of shares subscribed for by each are as follows:

| NAME | RESIDENCE | NO. OF SHARES |
|---|---|---|
| James M. Satterfield, | Dover, Delaware | 4 |
| L. B. Phillips | Dover, Delaware | 3 |
| J. B. Bailey | Dover, Delaware | 3 |

SIXTH: The corporation is to have perpetual existence.

SEVENTH: The private property of the stockholders shall not be subject to the payment of corporate debts to any extent whatsoever.

EIGHTH: The provisions which the incorporators hereby insert in the certificate of incorporation of the corporation for the regulation of the business and for the conduct of the affairs of the corporation and creating, defining, limiting and regulating the powers thereof and of the directors and stockholders, the same being in furtherance of and in addition to, and not in limitation of the powers now or hereafter conferred by the present or any future law or laws of the State of Delaware, are as follows:

1. The number of directors of the corporation, none of them need be a stockholder, shall be fixed and may be altered from time to time as may be provided by the By-Laws; and in case of any increase in the number

of directors, the additional directors shall be elected as provided by the By-Laws;

2. The board of directors shall have power to fix the amount of the accumulated profits of this corporation to be reserved as working capital, or for any other lawful purpose, prior to the declaration of any dividend upon the corporation's stock;

3. The corporation shall have power, acting through its board of directors, except that in cases where the action of the stockholders shall be required by statute, such action shall also be obtained,

(a) The board of directors shall have power to issue its stocks, bonds, or other obligations, from time to time, for such consideration as may be fixed, from time to time, by the board of directors;

(b) To borrow money and to make and issue notes, bonds, debentures, obligations and evidences of indebtedness, whether secured by mortgage, pledge or otherwise, and to secure the same by mortgage, pledge or otherwise of all or any part of its property or assets; and generally to make and perform agreements and contracts of every kind and description;

(c) The board of directors shall have power to make, alter, amend and repeal the By-Laws of this corporation, subject to the power of the stockholders to amend, alter or repeal any By-Laws thus adopted by the board of directors;

(d) To guarantee the payment of dividends or the principal and interest on the property, stocks, bonds,

debentures, or other securities issued by or the performance of any other contract or obligation of any other person, corporation, association or partnership whatsoever, so far as the same is not contrary to law, whenever, in the judgment of the board of directors or executive committee, it shall be necessary or proper for the business of the corporation or in the furtherance of its interest so to do;

(e) The board of directors shall have power, from time to time, to appoint an executive committee consisting of two or more of their number, which committee shall for the time being, as may be provided in a resolution of the board of directors, or in the By-Laws of this corporation, have or exercise any and all of the powers of the board of directors in the management of the business and affairs of this corporation;

(f) Both the stockholders and directors shall have power to hold their meetings either within or without the State of Delaware; and to keep the books, documents and records of this corporation, except as may be otherwise required by the laws of this State, outside of the State of Delaware;

(g) The board of directors shall have power to determine, from time to time, whether and to what extent and under what conditions and regulations the accounts, books and records of this corporation, other than as may be provided by the laws of Delaware, or any of them, shall be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any

account or book of document of this corporation, except as conferred by the Statutes of the State of Delaware, unless and until authorized to do so by a resolution of the directors or stockholders of this corporation;

(h) The corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation, in the manner now or hereafter prescribed by law, and all rights conferred on stockholders herein are subject to this reserved power;

(i) The directors and officers of this corporation may be directors and officers in other corporations, and transactions and contracts of this corporation with said other corporations shall not be affected by the fact that the officers hereof are interested in or are directors or officers of such other corporation or corporations;

(j) This corporation shall have the power to procure itself to be licensed or organized in any state or subdivision thereof of the United States, the District of Columbia, the territories, colonies or possessions of the United States, and in any foreign country.

IN WITNESS WHEREOF, we, the undersigned, being each of the original subscribers to the capital stock as hereinbefore specified, the said shares of which we respectfully agree to take, do hereby make and file this certificate, and accordingly have hereunto set our hands and seals on the 13th day of June, 1917.

IN THE PRESENCE OF:

Edwin F. Wood,
Geo. W. Albee,

[signature] (L.S.)
L. B. Phillips (L.S.)
J. B. Bailey (L.S.)

1011



EXHIBIT A
PAGE 70

STATE OF DELAWARE, )
) SS.:
COUNTY OF KENT, )

BE IT REMEMBERED, that on this thirteenth day of June, 1917, personally came before me, the subscriber and Notary Public in and for the County and State aforesaid, JAMES H. SATTERFIELD, L. B. PHILLIPS and J. B. BAILEY all the parties to the foregoing certificate of incorporation, known to me personally to be such, and severally acknowledged the said certificate to be the act and deed of the signers respectively, and that the facts therein stated are truly set forth.

GIVEN under my hand and seal of office the day and year aforesaid.

Edwin F. Wood
Notary Public.

0012



EXHIBIT A
PAGE 71

# Exhibit B

Exhibit B

EXHIBIT A

PAGE 72

# Refining and Marketing

ConocoPhillips is the second-largest refiner in the United States, with crude oil processing capacity of approximately 2.0 MMBD; and the world's fifth-largest nongovernment-controlled refiner, with crude oil processing capacity of more than 2.7 MMBD globally.

ConocoPhillips' Refining and Marketing (R&M) operations are comprised of global refining, marketing and transportation of petroleum products and related specialty businesses, as well as the development and management of downstream technology. These businesses upgrade crude oil and other feedstocks into higher-value petroleum products, including gasoline, diesel fuel, jet fuel, lubricants, coke and other specialty products.

Effective Jan. 1, 2007, ConocoPhillips and EnCana Corporation of Canada created an integrated, North American heavy oil business, consisting of both upstream and downstream assets. The downstream venture, WRB Refining LLC, consists of ConocoPhillips' Wood River and Borger refineries, located in Roxana, Ill., and Borger, Texas, respectively. Plans are to expand heavy oil processing capacity and throughput at these facilities by 2015. ConocoPhillips and EnCana each own 50 percent of the venture. However, ConocoPhillips holds a disproportionate economic interest in Borger for two years: 85 percent in 2007 and 65 percent in 2008. ConocoPhillips will purchase and transport all feedstocks for the refineries and sell the refined products. ConocoPhillips serves as operator of the downstream venture, which is headquartered in Houston. The upstream venture is described on Page 12.

The company's products are sold at some 13,000 retail and wholesale outlets around the world, primarily under the Phillips 66®, Conoco® and 76® brands in the United States and JET® brand in Europe.

ConocoPhillips owns or leases transportation assets – pipelines and terminals, marine and inland vessels, rail cars and trucks – to bring crude oil and feedstock to its refineries and to carry refined products to market.

## Facts

*(As of Jan. 1, 2007)*

- U.S. Refineries: 12 refineries
- International Refineries: Seven refineries in five countries
- U.S. Marketing: Markets through approximately 10,600 outlets
- Crude Processing Capability: U.S. – 2.0 MMBD; International – 0.7 MMBD
- Key Products: Gasoline, diesel fuel, jet fuel, liquefied petroleum gas (LPG), base oils, lubricants, solvents, aviation gasoline, and premium and fuel-grade petroleum cokes
- R&M Total Assets: $35.8 billion
- Employees: 20,267 (includes 8,013 retail store employees)

**U.S. Refining** *as of January 1, 2007*




EXHIBIT A

PAGE 73

# United States

ConocoPhillips divides its North American refining and marketing activities into four regions. Each region contains assets that are integrated by location, transportation, markets and commercial activities.

## Refining

**East Coast Region** *as of Jan. 1, 2007*

| Refinery | Crude Charge Capacity (MBD) | Total Charge Capacity (MBD)[1] | Gasoline Production Capacity (MBD) | Distillate Production Capacity (MBD) | Nelson Complexity Factor[2] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Bayway | 238 | 285 | 145 | 110 | 10.1 | 90% |
| Trainer | 185 | 190 | 105 | 65 | 7.8 | 87% |
| **Total** | **423** | **475** | **250** | **175** | | |

[1] Includes aviation and jet fuel. [2] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

### Bayway Refinery

The Bayway refinery, located on the New York Harbor in Linden, N.J., has a crude oil processing capacity of 238 MBD and processes mainly light, low-sulfur crude oil. Crude oil is supplied to the refinery by tanker, primarily from the North Sea, Canada and West Africa. The facility distributes its refined products to East Coast customers through pipelines, barges, rail cars and trucks.

The refinery produces a high percentage of transportation fuels, such as gasoline, ultra-low-sulfur diesel fuel and jet fuel. Other products include petrochemical feedstocks, home heating oil and residual fuel oil. The mix of products produced changes to meet seasonal demand. Gasoline is in higher demand during the summer, while in winter the refinery optimizes operations to increase heating oil production. The complex also includes a 775-million-pound-per-year polypropylene plant.

### Trainer Refinery

The Trainer refinery is located on the Delaware River in Trainer, Pa., about 10 miles southwest of the Philadelphia airport. The refinery has a crude oil processing capacity of 185 MBD and processes mainly light, low-sulfur crude oil. The Bayway and Trainer refineries are operated in coordination with each other by sharing crude oil cargoes and moving feedstocks between the facilities. Trainer receives crude oil from West Africa, Canada and the North Sea.

The refinery produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel. Other products include home heating oil, residual fuel oil and liquefied petroleum gas. Refined products primarily are distributed to customers in Pennsylvania, New York and New Jersey via pipeline, barge, rail car and truck, and home heating oil is distributed by tanker.

EXHIBIT A

PAGE 74

**Gulf Coast Region** *as of Jan. 1, 2007*

| Refinery | Crude Charge Capacity (MBD) | Total Charge Capacity (MBD) | Gasoline Production Capacity (MBD) | Distillate Production Capacity (MBD)[1] | Nelson Complexity Factor[2] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Alliance | 247 | 280 | 125 | 120 | 11.2 | 82% |
| Sweeny | 247 | 300 | 130 | 120 | 12.5 | 85% |
| Lake Charles | 239 | 280 | 90 | 110 | 8.5 | 71% |
| **Total** | **733** | **860** | **345** | **350** | | |

[1] Includes aviation and jet fuel. [2] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

### Alliance Refinery

The Alliance refinery, located on the Mississippi River in Belle Chasse, La., 25 miles south of New Orleans, has a crude oil capacity of 247 MBD and processes mainly light, low-sulfur crude oil. Alliance receives domestic crude oil from the Gulf of Mexico via pipeline, and foreign crude oil from the North Sea and West Africa via pipeline connected to the Louisiana Offshore Oil Port. The refinery produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel. Other products include petrochemical feedstocks, home heating oil and anode petroleum coke. The majority of the refined products are distributed to customers in the southeastern and eastern United States through major common-carrier pipeline systems and by barge.

The refinery returned to normal operations in April 2006 following repairs resulting from hurricane damage in the fall of 2005.

### Sweeny Refinery

The Sweeny refinery, located in Old Ocean, Texas, 65 miles southwest of Houston, has a crude oil processing capacity of 247 MBD. The refinery processes mainly heavy, high-sulfur crude oil, but also processes light, low-sulfur crude oil. The refinery primarily receives crude oil through wholly and jointly owned terminals on the Gulf Coast, including a deepwater terminal at Freeport, Texas. The refinery produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel. Other products include petrochemical feedstocks, home heating oil and petroleum (fuel) coke. Refined products are distributed throughout the Midwest and southeastern United States by pipeline, barge and rail car.

ConocoPhillips has a 50 percent interest in Merey Sweeny, L.P., a limited partnership that owns a 65 MBD delayed coker and related facilities at the Sweeny refinery. Petróleos de Venezuela S.A. (PDVSA), which owns the remaining 50 percent interest, supplies the refinery with Venezuelan crude oil. ConocoPhillips is the operating partner.

### Lake Charles Refinery

The Lake Charles refinery, located in Westlake, La., has a crude oil processing capacity of 239 MBD and processes mainly heavy, high-sulfur crude oil, as well as low-sulfur and acidic crude oil. The refinery receives domestic and foreign crude oil, with a majority of its foreign crude oil being heavy Venezuelan and Mexican crude oil delivered via tanker.

The refinery produces a high percentage of transportation fuels, such as gasoline, off-road diesel fuel and jet fuel, along with home heating oil. The majority of its refined products are distributed by truck, rail car, barge or major common-carrier pipelines in the southeastern and eastern United States. In addition, refined products can be sold into export markets through the refinery's marine terminal. The refinery facilities include a specialty coker and calciner, which produce graphite petroleum coke for the steel industry. The Lake Charles refinery supplies feedstocks to Excel Paralubes and Penreco, joint ventures that are part of our Specialty Businesses function within R&M.

EXHIBIT A
PAGE 75

## Central Region *as of Jan. 1, 2007*

| Refinery | Crude Charge Capacity (MBD) | Total Charge Capacity (MBD) | Gasoline Production Capacity (MBD) | Distillate Production Capacity (MBD)[1] | Complexity Factor[2] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Wood River* | 153 | 158 | 83 | 45 | 9.0 | 78% |
| Ponca City | 187 | 195 | 105 | 75 | 11.2 | 90% |
| Borger* | 124 | 153 | 94 | 47 | 13.3 | 92% |
| **Total** | **464** | **506** | **282** | **167** | | |

[1] Includes aviation and jet fuel. [2] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

* Amounts reflect the subtraction of volumes allocated to the downstream business venture with EnCana, effective Jan. 1, 2007. ConocoPhillips' 85 percent interest in Borger will reduce to 65 percent in 2008 and 50 percent in 2009.

### Wood River Refinery

The Wood River refinery is located on the east side of the Mississippi River in Roxana, Ill., about 15 miles northeast of St. Louis, Mo. It has a gross crude oil processing capacity of 306 MBD. Effective Jan. 1, 2007, the Wood River refinery became part of the business venture with EnCana. As a result, ConocoPhillips now has 50 percent interest in the refinery.

The refinery processes a mix of light, low-sulfur and heavy, high-sulfur crude oil. Wood River receives domestic and foreign crude oil by various pipelines and produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel. Other products include petrochemical feedstocks and asphalt. Through an off-take agreement, a significant portion of its gasoline and diesel fuel is sold to a third party for delivery via pipelines into the upper Midwest, including the Chicago, Ill., and Milwaukee, Wis., metropolitan areas. The remaining refined products are distributed to customers in the Midwest by pipeline, truck, barge and rail car.

In early 2007, the refinery completed the construction and startup of a facility utilizing ConocoPhillips' proprietary S-Zorb™ Sulfur Removal Technology (SRT) for the production of low-sulfur gasoline.

### Ponca City Refinery

The Ponca City refinery is located in Ponca City, Okla., and has a crude oil processing capacity of 187 MBD. The refinery processes a mixture of light, medium and heavy crude oil. Most of the crude oil processed is received by pipeline from the Gulf of Mexico, Oklahoma, Kansas, Texas and Canada. The Ponca City refinery is a high-conversion facility that produces a full range of products, including gasoline, diesel fuel, jet fuel, liquefied petroleum gas (LPG) and anode-grade petroleum coke. The refinery's facilities include fluid catalytic cracking, delayed coking and hydro-desulfurization units that enable it to produce high ratios of low-sulfur gasoline and ultra-low-sulfur diesel fuel from crude oil. Finished petroleum products are shipped by truck, rail car and company-owned and common-carrier pipelines to markets throughout the Mid-Continent region.

### Borger Refinery

The Borger refinery is located in Borger, Texas, in the Texas Panhandle about 50 miles north of Amarillo and includes a natural gas liquids fractionation facility. The gross crude oil processing capacity of the refinery is 146 MBD, and the natural gas liquids fractionation capacity is 45 MBD. Effective Jan. 1, 2007, the Borger refinery became part of the business venture with EnCana. As a result, ConocoPhillips now has 85 percent interest in the refinery, which will reduce to 65 percent in 2008 and 50 percent in 2009 onward, in accordance with terms of the agreement.

The refinery processes mainly light, low-sulfur and medium, high-sulfur crude oil. It receives crude oil and natural gas liquids feedstocks through ConocoPhillips pipelines from West Texas, the Texas Panhandle and Wyoming. The Borger refinery also can receive foreign crude oil via company-owned pipeline systems. The refinery produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel, along with a variety of natural gas liquids and solvents. Pipelines move refined products from the refinery to West Texas, New Mexico, Colorado and the Mid-Continent region.

During the second quarter of 2007, construction was completed on a 25 MBD coker and other modifications at the refinery. This project allows Borger to comply with clean fuel regulations for ultra-low-sulfur diesel fuel and low-sulfur gasoline, as well as comply with required reductions of sulfur dioxide emissions. The project will enable the refinery to improve operating performance by adding upgrading capability, improving utilization and increasing capacity to process heavy sour crude oil.

EXHIBIT A

PAGE 76

## West Coast Region *as of Jan. 1, 2007*

| Refinery | [illegible] Capacity (MBD) | [illegible] Capacity (MBD) | [illegible] Production Capacity (MBD) | [illegible] Capacity (MBD)[1] | [illegible] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Los Angeles | 139 | 155 | 85 | 61 | 14.6 | 87% |
| San Francisco | 120 | 135 | 50 | 45 | 11.7 | 70% |
| Ferndale | 96 | 100 | 50 | 30 | 8.1 | 76% |
| Billings | 58 | 64 | 35 | 25 | 13.8 | 89% |
| **Total** | **413** | **454** | **220** | **161** | | |

[1] Includes aviation and jet fuel. [2] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

### Los Angeles Refinery

The Los Angeles refinery is composed of two linked facilities located roughly five miles apart in Carson and Wilmington, Calif., about 15 miles southeast of the Los Angeles International Airport. Carson serves as the front-end of the refinery by processing crude oil, and Wilmington serves as the back-end by upgrading the products.

The refinery has a crude oil processing capacity of 139 MBD and processes mainly heavy high-sulfur crude oil. The refinery receives domestic crude oil via pipeline from California and both foreign and domestic crude oil by tanker through a third-party terminal in the Port of Long Beach. The refinery produces a high percentage of transportation fuels, such as gasoline, diesel fuel and jet fuel. Other products include fuel-grade petroleum coke. The refinery produces California Air Resources Board (CARB) gasoline, using ethanol, to meet government-mandated oxygenate requirements. Refined products are distributed to customers in southern California, Nevada and Arizona by pipeline and truck.

In late 2005, ConocoPhillips entered into an agreement to utilize a proposed facility to provide additional waterborne crude oil receipt capacity in the Los Angeles harbor. This facility would allow the refinery to increase its proportion of waterborne crude oil versus California crude oil and to accept crude oil from large tankers.

### San Francisco Refinery

The San Francisco refinery is composed of two facilities linked by a 200-mile pipeline. The Santa Maria facility is located in Arroyo Grande, Calif., while the Rodeo facility is in the San Francisco Bay area. The combined facilities have a total crude oil processing capacity of 120 MBD.

The refinery processes mainly heavy, high-sulfur crude oil. The refinery receives crude oil from California and foreign sources by tanker. Semirefined liquid products from the Santa Maria facility are sent by pipeline to the Rodeo facility for upgrading into finished petroleum products. A high proportion of the refinery's production is transportation fuel, such as gasoline, diesel fuel and jet fuel. The refinery produces CARB gasoline, using ethanol, to meet government-mandated oxygenate requirements. Refined products are distributed by pipeline, rail car, truck and barge to customers in California.

### Ferndale Refinery

The Ferndale refinery is located on Puget Sound in Ferndale, Wash., about 20 miles south of the U.S.-Canada border and has a crude oil capacity of 96 MBD. The refinery processes primarily light, low-sulfur crude oil. Ferndale operates a deepwater dock that is capable of accommodating tankers bringing Alaskan North Slope crude oil from Valdez, Alaska. The refinery also receives Canadian crude oil via pipeline. The refinery produces transportation fuels, such as gasoline and diesel fuel. Other products include residual fuel oil supplying the northwest marine transportation market. Most refined products are distributed by pipeline and barge to major markets in the northwest United States.

### Billings Refinery

The Billings refinery is located in Billings, Mont. The refinery has a crude oil processing capacity of 58 MBD, and processes a mixture of Canadian heavy, high-sulfur crude, plus domestic high-sulfur and low-sulfur crude oil, all delivered by pipeline. A delayed coker converts heavy, high-sulfur residue into higher-value light oils. The refinery produces a high percentage of transportation fuels, such as gasoline, aviation and diesel fuels, as well as fuel-grade petroleum coke. Finished petroleum products from the refinery are delivered via pipeline, rail car and truck. Pipelines transport most of the refined products to markets in Montana, Wyoming, Utah and Washington.

EXHIBIT A

PAGE 77

# Marketing

In the United States, ConocoPhillips markets gasoline, diesel fuel, aviation fuel and convenience products principally through approximately 10,600 branded outlets. These outlets include company-owned and company-operated retail outlets, company-owned and dealer-operated retail outlets, and outlets owned and operated by independent dealers and wholesale marketers. All outlets are branded with the Phillips 66®, Conoco® or 76® trademarks and feature gasolines that have been recognized as Top Tier by leading automakers since 2004 *(www.toptiergas.com)*. These operations are strategically served by the company's refineries and transportation systems.

## Wholesale Marketing

In its wholesale operations, ConocoPhillips utilizes a network of marketers and dealers operating approximately 9,600 outlets. Refined products are marketed on both a branded and unbranded basis. The company has made a decision to emphasize the wholesale channel of trade. Excluding bulk transactions and product supply activity, wholesale volumes in 2006 were approximately 350 MMBBL.

ConocoPhillips announced in January 2007 that it is withdrawing its brands from gasoline and diesel fuel sales in Minnesota, North Carolina, South Carolina and certain portions of Wisconsin, North Dakota, South Dakota, Arizona and Nevada, effective during the third quarter of 2007.

In addition to automotive gasoline and diesel fuel, the company produces and markets jet fuel and aviation gasoline through independent marketers and dealers at approximately 580 Phillips 66® branded locations, as well as through unbranded and military channels.

## Retail Marketing

ConocoPhillips owns and operates approximately 330 retail outlets under the Phillips 66®, Conoco® and 76® brands. The company-operated retail outlets are focused in 10 states, mainly in the Mid-Continent, Rocky Mountains and West Coast regions. Retail fuel volumes for 2006 were approximately 15 MMBBL.

Additionally, CFJ Properties, the company's 50/50 joint venture with Flying J, owns and operates 100 truck travel plazas that carry the Conoco® and/or Flying J brands.

In December 2006, ConocoPhillips announced its intention to divest its company-owned retail outlets. Of the approximately 830 outlets scheduled for divestiture, 330 are company operated.

EXHIBIT A

PAGE 78

U.S. Marketing and Transportation Assets *as of March 31, 2007*



* Market share based on all ConocoPhillips stations as a percentage of total stations in region.
** Terminals based on refined products and LPG terminals.

ConocoPhillips markets fuel under these brands in the United States.

# Transportation

ConocoPhillips owns or leases various assets to provide strategic, timely and environmentally safe delivery and storage of crude oil, refined products and natural gas liquids. These assets include thousands of miles of pipeline systems; product, crude oil and liquefied petroleum gas (LPG) terminals; a coke exporting facility; a fleet of innovative, environmentally sound marine and inland vessels; and a diverse fleet of rail cars.

**Pipelines and Terminals**

As of Jan. 1, 2007, ConocoPhillips had approximately 30,000 miles of common-carrier crude oil, raw natural gas liquids and petroleum products pipeline systems in the United States, including those partially owned and/or operated by affiliates. The company also owned and/or operated 65 finished product terminals, 10 liquefied petroleum gas terminals, 10 crude oil terminals and one coke exporting facility.

**Marine Vessels**

On Dec. 31, 2006, the company had under charter 15 double-hulled crude oil tankers, with capacities ranging in size from 650,000 to 1,100,000 barrels. These tankers are utilized to transport feedstocks to certain ConocoPhillips U.S. refineries. In addition, the company has a domestic fleet of both owned and chartered boats and barges providing inland and ocean-going waterway transportation. This

EXHIBIT A



PAGE 79

excludes the operations of the company's subsidiary, Polar Tankers, Inc., which is discussed in the E&P section, along with the owned tanker on lease to a third party for use in the North Sea.

### Truck and Rail

A joint venture, Sentinel Transportation, LLC, provides dedicated and specialized trucking services for ConocoPhillips and DuPont. The $96 million trucking entity has more than 700 employees based at 40 terminals, operating approximately 400 transports, and driving 34 million miles per year to deliver petroleum feedstocks, finished products and specialty chemicals across the United States. ConocoPhillips represents nearly 60 percent of Sentinel's business activity.

Rail movements are provided via a diverse fleet of over 6,300 owned and leased rail cars moving products in support of U.S. refinery and specialty operations.

## Major Pipeline Systems *as of Jan. 1, 2007*

| Interest | Name | Origination/Terminus | Type | Size | Miles | Capacity (BD) |
|---|---|---|---|---|---|---|
| 100% | Sweeny to Pasadena | Sweeny, TX/Pasadena, TX | Product | 12-18" | 121 | 265,500 |
| 100% | Coast and Valley System | Central CA/Bay Area, CA | Crude | 8-12" | 600 | 210,000 |
| 100% | Gold Line | Borger, TX/East Chicago, IL | Product | 8-16" | 961 | 130,000 |
| 100% | Cushing | Cushing, OK/Ponca City, OK | Crude | 18" | 59 | [illegible] |
| 100% | Oklahoma Mainline/CPL | Wichita Falls, TX/Ponca City, OK | Crude | 12" | 274 | [illegible] |
| 100% | WA Line | Odessa, TX/Borger, TX | Crude | 12-14" | 290 | [illegible] |
| 0%[1] | Line EZ | [illegible], TX/Sweeny, TX | NGL | 10" | [illegible] | [illegible] |
| 100% | Seaway Products | Pasadena, TX/Cushing, OK | Product | 16-20" | 523 | [illegible] |
| 100% | Standish | Cushing, OK/Wichita, KS | Product | 8-12" | 148 | [illegible] |
| 100% | Line 0 | Cushing, OK/Borger, TX | Crude | 10" | 220 | [illegible] |
| 100% | Wood River | Ponca City, OK/Mt. Vernon, MO | Product | 10-12" | 238 | [illegible] |
| 100% | Los Angeles and Ventura | Ventura, CA/Los Angeles Basin, CA | Crude | 8-16" | 492 | [illegible] |
| 100% | Seminoe | Billings, MT/Sinclair, WY | Product | 8-12" | [illegible] | [illegible] |
| 100% | Oklahoma City/Cherokee B | Ponca City, OK/Oklahoma City, OK | Product | [illegible] | 79 | [illegible] |
| 100% | Wichita | Ponca City, OK/Wichita, KS | Product | 8-10" | 129 | [illegible] |
| 100% | Line 80 | Gaines, TX/Borger, TX | Crude | 8-12" | 235 | [illegible] |
| 100% | Cheyenne Products | Cheyenne, WY/Sidney, NE | Product | 6" | 120 | 21,000 |
| 100% | Powder River | Douglas, WY/Borger, TX | NGL | 6" | 700 | 18,500 |
| 100% | East Texas | Greenville, TX/Mount Pleasant, TX | Product | 6" | 75 | 16,000 |
| 79.2% | Glacier | Cut Bank, MT/Billings, MT | Crude | 10-12" | 827 | 110,000 |
| 70% | Borger-Denver | McKee, TX/Denver, CO | Product | 8-12" | 318 | 42,000 |
| 67% | Kansas City | Paola, KS/Kansas City, MO | Product | 8-10" | 54 | 89,000 |
| 50%[2] | Seaway Crude | [illegible], TX/Cushing, OK | Crude | 30" | 542 | 350,000 |
| 50% | Pioneer | Sinclair, WY/Salt Lake City, UT | Product | 8-12" | 305 | 63,000 |
| 50% | ATA Line | Amarillo, TX/Albuquerque, NM | Product | 6-10" | 293 | 32,000 |
| 50% | Skelly-Belvieu | Skellytown, TX/Mont Belvieu, TX | Product | 8" | 572 | 30,000 |
| 50% | Heartland | McPherson, KS/Des Moines, IA | Product | 8-6" | 36 | 30,000 |
| 50% | Chisholm | Kingfisher, OK/Conway, KS | NGL | 6-10" | 185 | 29,000 |
| 46% | Yellowstone | Billings, MT/Spokane, WA | Product | 10" | 654 | 68,000 |
| 33% | Harbor | Woodbury, NJ/Linden, NJ | Product | 16" | 80 | 104,000 |
| 33% | El Paso | McKee, TX/El Paso, TX | Product | 10" | 408 | 62,000 |
| 33% | SAAL | Amarillo, TX/Amarillo and Lubbock, TX | Product | 6" | 121 | 18,000 |
| 16.6% | Colonial | Pasadena, TX/New York, NY | Product | 30-40" | 5,300 | 2,200,000 |
| 13.8% | Explorer | Texas Gulf Coast/Chicago, IL | Product | 24-28" | 1,400 | 500,000 |

[1] 100% interest held by CPChem. Operated by ConocoPhillips Pipe Line Co.
[2] 50% ownership in management company.

EXHIBIT A
PAGE 80

# International

## Europe

ConocoPhillips owns or has an interest in six refineries in Europe, with an aggregate rated crude oil capacity of 636 MBD. The company also has marketing operations through JET* and COOP* outlets and convenience stores.

### Refining

**Europe Refining** *as of Jan. 1, 2007*

| Refinery | Crude Charge Capacity Net (MBD) | Total [illegible] Capacity [illegible] | Gasoline Production Capacity Net (MBD) | [illegible] Production Capacity [illegible] (MBD) | Nelson Complexity Factor[2] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Wilhelmshaven | 260 | 260 | 36 | 102 | 5.0 | 53% |
| Humber | 221 | 228 | 84 | 119 | 12.1 | 84% |
| Whitegate | 71 | 71 | 18 | 30 | 6.6 | 65% |
| MiRO | 57 | 60 | 25 | 26 | 9.3 | 85% |
| Czech Refineries | 27 | 28 | 8 | 11 | 7.9 | 63% |
| **Total** | **636** | **646** | **170** | **287** | | |

[1] Includes aviation and jet fuel. [2] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

#### Wilhelmshaven Refinery

In February 2006, ConocoPhillips completed its purchase of the Wilhelmshaven refinery in Wilhelmshaven, Germany, from Louis Dreyfus Energy Holdings Limited. The purchase included the 260 MBD refinery, a marine terminal, rail and truck loading facilities, and a tank farm, as well as another entity that provides commercial and administrative support to the refinery. Crude oil processed by the refinery is primarily low-sulfur varieties produced in the North Sea. The refinery primarily produces transportation fuels, fuel oil and intermediate feedstocks, which are distributed to the inland market via truck and also transported to other nations in Europe and to the United States.

#### Humber Refinery

ConocoPhillips' wholly owned Humber refinery is located in North Lincolnshire, United Kingdom, and has a crude oil processing capacity of 221 MBD. Crude oil processed at the refinery is supplied primarily from the North Sea and includes light low-sulfur and acidic crude oils.

Humber is one of the most complex refineries in ConocoPhillips' portfolio and one of the most sophisticated in Europe. It is a fully integrated refinery that produces a high proportion of transportation fuels, such as gasoline and diesel fuel. Humber's fluid catalytic cracking unit/thermal cracking/coking configuration means that substantial volumes of other feedstocks, such as low-sulfur fuel oil and vacuum gas oil, are processed alongside crude oil to fully utilize Humber's cracking capability. The refinery's location on the east coast of England provides for cost-effective North Sea crude imports and product exports to European and U.S. markets.

The refinery also has two coking units with associated calcining plants that upgrade the heavy bottoms and imported feedstocks into light-oil products and high-value graphite and anode petroleum cokes. Humber is the only coking refinery in the United Kingdom and is the world's largest producer of specialty graphite cokes and the largest anode coke producer in Europe.

Approximately 70 percent of the light oils produced in the refinery are marketed in the United Kingdom, while the other products are exported to the rest of Europe and the United States.

#### Whitegate Refinery

The Whitegate refinery is located in Cork, Ireland. Whitegate is Ireland's only refinery and has a crude oil processing capacity of 71 MBD. Crude oil processed by the refinery is light, low-sulfur crude oil sourced mostly from the North Sea. Refined products are distributed inland and exported to international markets. ConocoPhillips also operates a crude oil and products storage complex with 7.5 million barrels of storage facilitated by an offshore mooring buoy in Bantry Bay, Cork, Ireland.

#### MiRO Refinery

The MineraloelRaffinerrie Oberrhein GmbH (MiRO) refinery in Karlsruhe, Germany, is a joint-venture refinery with a gross crude oil processing capacity of 307 MBD, approximately 45 percent being low-cost, high-sulfur crude.

ConocoPhillips has an 18.75 percent interest in MiRO, with a capacity share of 57 MBD. The other owners of MiRO are Shell Deutschland Oil GmbH, Esso Deutschland GmbH and Ruhr Oel GmbH (a 50/50 joint venture between BP and PDVSA). The refinery processes crude oil and other feedstocks supplied by each of the owners in proportion to their respective ownership interests, with each receiving their proportionate share of the products to market.

EXHIBIT A



PAGE 81

The MiRO complex is a fully integrated refinery, producing gasoline, middle distillates and specialty products, along with a small amount of residual fuel oil. The refinery has a high capacity to convert lower-cost feedstocks into higher-value products, primarily with a fluid catalytic cracker and delayed coker. The refinery produces both fuel-grade and specialty calcined cokes.

### Czech Refineries

ConocoPhillips, through its participation in Česká Rafinérská, a.s. (CRC), has an interest in two refineries in the Czech Republic, one in Kralupy and the other in Litvinov. The other owners of CRC are Unipetrol a.s., ENI International BV and Shell Overseas Investment B.V. The refinery at Litvinov has a gross crude oil processing capacity of 103 MBD, and the Kralupy refinery has a gross crude oil processing capacity of 63 MBD. ConocoPhillips' 16.33 percent ownership share of the combined capacity is 27 MBD. Litvinov processes light, low-sulfur Russian export-blend crude oil delivered by pipeline. Kralupy utilizes low-sulfur crude oil from the Mediterranean area.

The two refineries complement each other and are operated on an overall optimized basis, with certain intermediate streams moving between the two facilities. Each equity owner markets its share of finished products in the Czech Republic and neighboring markets. The company plans to divest its interests in the refineries during 2007.

## Marketing

ConocoPhillips has marketing operations in Europe through company-owned and dealer-owned JET* branded outlets. Through the company's joint-venture operations in Switzerland, ConocoPhillips also has an equity interest in approximately 184 sites marketing under the Coop brand name. The largest of the company's European marketing networks are in Germany and the United Kingdom. A portion of Irish refinery production is sold to inland Irish markets.

The company's European marketing strategy is to sell primarily through owned, leased or joint-venture retail sites using a low-cost, high-volume strategy. ConocoPhillips also markets aviation fuels, liquid petroleum gases, heating oils, transportation fuels and marine bunker fuels to commercial customers and into the bulk or spot market.

ConocoPhillips has announced its intention to divest some non-strategic marketing businesses during 2007. As of June 30, 2007, ConocoPhillips had completed the sale of marketing assets in Belgium, the Czech Republic, Finland, Hungary, Luxembourg, Poland and Slovakia.

**Europe Downstream** *as of March 31, 2007*




JET coop mineraloel

ConocoPhillips primarily markets fuel under these brands in Europe and Asia.

EXHIBIT A
PAGE 82

# Asia Pacific

ConocoPhillips has had downstream operations in the Asia Pacific region since 1993. The company has an interest in a joint-venture refinery in Melaka, Malaysia, and petroleum coke marketing operations in several countries in the region. The company's retail businesses in Thailand and Malaysia were sold in 2007.

## Refining

**Asia Pacific Refining** *as of Jan. 1, 2007*

| Refinery | Crude Charge Capacity, Net (MBD) | Total Charge Capacity (MBD) | Gasoline Production Capacity Net (MBD) | Distillate Production Capacity Net (MBD) | Nelson Complexity Factor[1] | Clean Product Yield |
|---|---|---|---|---|---|---|
| Melaka Refinery | 60 | 60 | 14 | 36 | 9.2 | 85% |

[1] The Nelson Complexity Factor calculation considers the variety and capacity of the different processing units within a refinery. The higher a refinery's factor, the greater is its secondary conversion capacity and capability to produce higher-value products.

### Melaka Refinery

The refinery in Melaka, Malaysia, is a joint venture with Petronas, the Malaysian state oil company. ConocoPhillips owns a 47 percent interest in the joint venture. The refinery has a rated crude oil processing capacity of 128 MBD of which the company's share is 60 MBD. The medium, high-sulfur crude oil processed by the refinery is sourced mostly from the Middle East. The refinery produces a full range of refined petroleum products. The refinery capitalizes on ConocoPhillips' proprietary coking technology to upgrade low-cost feedstocks to higher-margin products.

## Marketing

Before their divestment in June 2007, ConocoPhillips owned and operated 147 JET® branded outlets in Thailand. In addition, through a joint venture in Malaysia, there were 44 ProJET® retail outlets, including 40 company-owned, dealer-operated sites, and four dealer-owned and dealer-operated sites.

ConocoPhillips also markets specialty cokes in the region, sourced out of the Humber refinery in the United Kingdom and the Lake Charles refinery in the United States, and assists in the marketing of Melaka's fuel coke locally.

**Asia Pacific Downstream** *as of March 31, 2007*




EXHIBIT A
PAGE 83

# Specialty Products

ConocoPhillips manufactures and markets lubricants and specialty products. Finished lubricants, petroleum coke, waxes, solvents and pipeline flow improvers are sold to commercial, industrial and wholesale buyers worldwide.

### Petroleum Coke

The company's technical expertise in delayed coking is heavily utilized internally and is licensed to the industry as the technology of choice for upgrading heavy residues. In addition, expertise in carbon upgrading supports the supply of specialty cokes to the steel, aluminum and titanium dioxide industries. ConocoPhillips supplies all grades of calcined coke to multiple countries, with production from its refineries located in North America and the United Kingdom. Our manufacturing, technology and quality control combine to support our position as the largest global producer of graphite coke.

### Finished Lubricants

ConocoPhillips is one of the largest finished lubricants suppliers in the United States. It manufactures and markets four major lubricant brands: Phillips 66,® Conoco,® 76 Lubricants® and Kendall® Motor Oil. The combination of these diverse brands, along with supplying a number of private-label and original-equipment manufacturers in North America, gives ConocoPhillips a position in all key lubricants markets. Nationwide, the distribution network consists of marketers, mass merchandise stores, fast lubes, tire stores, automotive dealers and convenience stores.

### Base Oil

The company's 50 percent-owned Excel Paralubes joint venture is a hydrocracked lubricant base oil manufacturing facility located adjacent to the Lake Charles refinery. The facility produces approximately 20 MBD of high-quality, clear hydrocracked base oils. The Lake Charles refinery supplies Excel Paralubes with gas-oil feedstocks. ConocoPhillips purchases 50 percent of the joint venture's output and blends the base oil into finished lubricants or markets it to third parties. ConocoPhillips has an exclusive agreement with S-Oil Corporation to distribute and market their base oils in North America.

### CSPI

ConocoPhillips Specialty Products Inc. (CSPI) supplies flow improver products to customers on six continents. LiquidPower™ Flow Improvers maximize the flow potential of pipelines while increasing their operational flexibility, throughput capacity and economic performance. Millions of barrels of hydrocarbon liquids are treated with LiquidPower™ Flow Improvers for crude oils, refined products and select water applications.

### Solvents

ConocoPhillips directly, and through the Penreco joint venture, manufactures and markets a broad array of specialty solvents for use in chemical manufacturing and other industries.

PHILLIPS 66 · CONOCO · 76 · Kendall · LiquidPower FLOW IMPROVERS · ThruPlus Delayed Coking Technology

ConocoPhillips markets specialty products under these brands.

EXHIBIT A

PAGE 84

# Exhibit C

Exhibit C

EXHIBIT A
PAGE 85

# Chemicals

## Chevron Phillips Chemical Company LLC

Chevron Phillips Chemical Company LLC (CPChem) is owned 50 percent by ConocoPhillips and 50 percent by Chevron Corporation. CPChem is one of the world's largest producers of olefins, polyolefins, aromatics and styrenics, piping and proprietary plastics.

Headquartered in The Woodlands, Texas, CPChem manufactures and markets a wide range of petrochemicals on a worldwide basis through its subsidiaries and equity affiliates, with manufacturing facilities located in the United States, Puerto Rico, Singapore, China, South Korea, Saudi Arabia, Qatar and Belgium. CPChem's business is comprised of three primary operating segments: Olefins & Polyolefins, Aromatics & Styrenics, and Specialty Products.

**At year-end 2006, CPChem:**

- Had total revenue of $12 billion.
- Had approximately $7 billion in assets.
- Owned 30 manufacturing facilities and six research and technology centers in seven countries.
- Employed approximately 5,150 people.
- Produced chemical products essential to manufacturing more than 70,000 consumer and industrial products.

### U.S. Chemicals




EXHIBIT A

PAGE 86

## CPChem Plants

| Facility/Location | [illegible] | [illegible] | Approximate Gross Capacity (million pounds per year) |
|---|---|---|---|
| Pasadena Plastics Complex *Pasadena, Texas* | Aromatics & Styrenics | K-Resin® SBC | 230 |
| | Olefins & Polyolefins | High-density polyethylene | 2,150 |
| Sweeny Facility *Old Ocean, Texas* | Olefins & Polyolefins | Ethylene | 4,155 |
| | Olefins & Polyolefins | Propylene | 1,165 |
| Borger Facility *Borger, Texas* | Specialty Products | Organosulfur chemicals | 172 |
| | Specialty Products | Ryton® PPS polymer | 22 |
| | Specialty Products | Performance and reference fuels | 120 |
| | Specialty Products | High-purity hydrocarbons and solvents | 140 |
| Cedar Bayou Facility *Baytown, Texas* | Olefins & Polyolefins | Ethylene | 1,770 |
| | Olefins & Polyolefins | Propylene | 920 |
| | Olefins & Polyolefins | NAO | 1,500 |
| | Olefins & Polyolefins | Polyalphaolefins | 104 |
| | Olefins & Polyolefins | Linear-low, low-, and high-density polyethylene | 1,970 |
| Orange Chemical Facility *Orange, Texas* | Olefins & Polyolefins | High-density polyethylene | 920 |
| Port Arthur Facility *Port Arthur, Texas* | Olefins & Polyolefins | Ethylene | 1,770 |
| | Olefins & Polyolefins | Propylene | 735 |
| | Aromatics & Styrenics | Cyclohexane | 920 |
| Drilling Specialties *Conroe, Texas* | Specialty Products | Drilling specialty chemicals | 35 |
| Houston Compounding Facility *La Porte, Texas* | Specialty Products | Ryton® PPS compounds | 15 |
| St. James Facility *St. James, La.* | Aromatics & Styrenics | Styrene | 2,100 |
| Pascagoula Facility *Pascagoula, Miss.* | Aromatics & Styrenics | Paraxylene | 1,000 |
| | Aromatics & Styrenics | Benzene | 1,640 |
| Marietta Facility *Marietta, Ohio* | Aromatics & Styrenics | Polystyrene | 770 |
| Puerto Rico Facility *Guayama, Puerto Rico* | Aromatics & Styrenics | Paraxylene | 715 |
| Performance Pipe Division 9 locations in the United States | Olefins & Polyolefins | Polyethylene pipe, conduit & pipe fittings | 630 |
| **Non-U.S.** | | | |
| Plastics Compounding and Development Center, *Singapore* | Specialty Products | Ryton® PPS compounds | 11 |
| Zhangjiagang, China Facility *Zhangjiagang, China* | Aromatics & Styrenics | Polystyrene | 220 |
| Tessenderlo Chemicals Facility *Tessenderlo, Belgium* | Specialty Products | Organosulfur chemicals | 84 |
| Kallo Compounding Facility *Kallo-Beveren, Belgium* | Specialty Products | Ryton® PPS compounds | 20 |

EXHIBIT A
PAGE 87

## CPChem Plants

| Facility/Location | | | Approximate Gross Capacity (million pounds per year) |
|---|---|---|---|
| **Joint Venture Facilities:** | | | |
| Qatar Chemical Company Ltd. (Q-Chem) *Mesaieed, Qatar* | Olefins & Polyolefins | Ethylene | 1,100 |
| | Olefins & Polyolefins | High-density polyethylene | 1,000 |
| | Olefins & Polyolefins | 1-hexene | 100 |
| Chevron Phillips Singapore Chemicals (Private) Limited, *Singapore* | Olefins & Polyolefins | High-density polyethylene | 860 |
| Shanghai Golden Phillips Petrochemical Co. *Jinshanwei, China* | Olefins & Polyolefins | High-density polyethylene | 300 |
| Phillips Sumika Polypropylene Company, *Pasadena, Texas* | Olefins & Polyolefins | Polypropylene | 830 |
| Saudi Chevron Phillips Company *Al Jubail, Saudi Arabia* | Aromatics & Styrenics | Benzene | 1,180 |
| | Aromatics & Styrenics | Cyclohexane | 620 |
| K R Copolymer Co. Ltd. *Yeosu, South Korea* | Aromatics & Styrenics | K-Resin SBC | 115 |

## Worldwide Chemicals




* See map on page 60.

EXHIBIT A
PAGE 88

## CPChem Net Petrochemical and Net Plastics Product Capacities

| Petrochemicals and Plastics Product Capacities | Net (U.S.) | Net (Worldwide) |
|---|---|---|
| Olefins and Polyolefins | 18,187 | 19,815 |
| Ethylene[1] | 7,695 | 8,234 |
| Propylene | 2,820 | 2,820 |
| HDPE[2,3] | 4,030 | 5,070 |
| LDPE | 600 | 600 |
| LLDPE | 410 | 410 |
| Polypropylene | 498 | 498 |
| Normal Alpha Olefins (NAO)[4] | 1,500 | 1,549 |
| Polyalphaolefins (PAO) | 104 | 104 |
| Polyethylene Pipe | 530 | 530 |
| Aromatics and Styrenics | 6,560 | 8,464 |
| Benzene[5] | 1,540 | 2,130 |
| Cyclohexane[6,7] | 920 | 1,230 |
| Paraxylene[8] | 1,000 | 1,715 |
| Styrene | 2,100 | 2,100 |
| Polystyrene | 770 | 990 |
| K-Resin® SBC[9] | 230 | 299 |
| Specialty Products | 482 | 597 |
| Specialty Chemicals and Plastics | 467 | 551 |
| Ryton® PPS[10] | 15 | 46 |

1 Worldwide ethylene capacity reflects CPChem's share of an equity affiliate's capacity in Qatar.

2 U.S. HDPE capacity reflects CPChem's 50 percent interest (410 million pounds) in co-owned capacity at Cedar Bayou facility in Baytown, Texas.

3 Worldwide HDPE capacity reflects co-owned capacity at Cedar Bayou facility and CPChem's shares of its joint-venture facilities in Qatar, Singapore and Jinshanwei, China.

4 Worldwide NAO capacity reflects CPChem's share of an equity affiliate's capacity in Qatar.

5 Worldwide benzene capacity reflects CPChem's share of an equity affiliate's capacity in Saudi Arabia.

6 Cyclohexane reflects CPChem's net production capacity only. If you include exclusive marketing rights to ConocoPhillips' Sweeny refinery cyclohexane production, then total net U.S. and net worldwide cyclohexane marketing capabilities are 1,520 MM and 1,830 MM pounds, respectively.

7 Worldwide cyclohexane capacity reflects CPChem's share of an equity affiliate's capacity in Saudi Arabia.

8 Paraxylene capacity reflects 715 million pounds of capacity, which currently is idled at Core facility in Guayama, Puerto Rico.

9 Worldwide K-Resin® SBC capacity reflects CPChem's share of an equity affiliate's capacity in South Korea.

10 Ryton® PPS production capacity defined by compounding capability available at Singapore; Kallo-Beveren, Belgium; and La Porte, Texas, of 11 MM, 20 MM and 15 MM pounds/yr., respectively. Borger, Texas, currently capable of producing 22 MM pounds of polymer which is combined with additives/modifiers at compounding operations to provide final product grades.

## Growth

### United States

Construction is under way on a new 22-million-pound-per-year Ryton® polyphenylene sulfide plant in Borger, Texas. Built next to CPChem's existing PPS plant in Borger, the new facility will double the company's total PPS capacity to approximately 44 million pounds per year. Project completion is anticipated in early 2009.

### Middle East

While a strong player in the North American petrochemical business, the company's Middle Eastern operations also play a significant and growing role in CPChem's success. With two major facilities in operation, two more under construction and another project under development, CPChem is committed to international growth and development.

Saudi Chevron Phillips Company (in operation since 1999) and Jubail Chevron Phillips Company (scheduled for operational startup in 2007) are 50/50 joint ventures between a CPChem affiliate and the Saudi Industrial Investment Group. The plants, collectively known as S-Chem, represent CPChem's Saudi Arabian assets. A third project in Saudi Arabia is under development with good progress reported, including key technology licenses and feedstock allocations.

Qatar Chemical Company Ltd. (Q-Chem) and Qatar Chemical Company II Ltd. (Q-Chem II) are joint ventures between a subsidiary of CPChem (49 percent) and Qatar Petroleum (51 percent). Q-Chem commenced operations in 2003 while the Q-Chem II project broke ground in 2006.

EXHIBIT A

PAGE 89

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **DECLARATION OF RUSSELL H. OECHSEL, JR. IN SUPPORT OF DEFENDANT CONOCOPHILLIPS' NOTICE OF REMOVAL OF ACTION** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan
[Print Name of Person Executing Proof]

David B. Kirvan
[Signature]

EXHIBIT A

PAGE 90

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **NOTICE TO ADVERSE PARTIES AND THE SUPERIOR COURT OF FILING OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §§ 1332, 1441(A), 1446 TO THE UNITED STATES DISTRICT COURT** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel.: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (STATE) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan
[Print Name of Person Executing Proof]

[Signature]

EXHIBIT A
PAGE 91

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2029 Century Park East, Suite 2400, Los Angeles, California 90067. On October 29, 2007, I served the foregoing document(s) described as: **DEFENDANT CONOCOPHILLIPS COMPANY'S CERTIFICATION AS TO INTERESTED PARTIES** on the interested party(ies) below, using the following means:

Joel C. Golden, Esq.
THE LAW OFFICE OF JOEL C. GOLDEN
2356 Moore Street, Suite 201
San Diego, California 92110
Tel: 619.294.7918
Fax: 619.296.8229
*Attorneys for Plaintiff*

☒ BY UNITED STATES MAIL I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2007 at Los Angeles, California.

David B. Kirvan — [signature]
[Print Name of Person Executing Proof] — [Signature]